LEWIS (ADAMS v.). See Case No. 60.

---

## Case No. 8,316.

### LEWIS et al. v. BAIRD et al.

[3 McLean, 56.] [1]

Circuit Court, D. Ohio. July Term, 1842.

PLEADING IN EQUITY — ANSWER IN SUPPORT OF PLEA — DIFFERENT DEFENCES — ASSIGNMENT OF EQUITY — RECORDATION — LOST DEED—COPY OF DEED—CAPACITY TO CONVEY — PRESUMPTION AS TO OLD ASSIGNMENT — STATUTE OF LIMITATIONS —STATE CLAIM.

1. There must be an answer denying the fraud charged in the bill, in support of the plea.

2. The answer being broader than the plea, overrules it.

3. Fraud must be denied in the plea as well as in the answer.

4. Where one defence is made by the plea, and another by the answer, the plea will be ordered to stand for an answer.

5. The ordinance of 1787 regulates the form of conveyance of real estate.

[Cited in Reed v. Kemp, 16 Ill. 451; Churchill v. Little, 23 Ohio St. 308; Tarbell v. West, 86 N. Y. 288.]

6. An equity may be assigned or transferred in any form not prohibited by law.

7. Though an equity be conveyed, under the forms of a legal right, it does not change the title.

8. The recordation of a deed, conveying an equity only, would not be noticed under the law.

[Cited in Peterson v. Mississippi Valley Ins. Co. 24 Iowa, 498.]

9. A record of a deed in Kentucky, for lands in Ohio, is no notice to a subsequent purchaser.

10. A copy of such record is not evidence.

11. The contents of a deed, destroyed by accident, may be proved by parol.

12. Where there has been a great lapse of time, strict proof of a destroyed deed, under which parties have claimed, may be dispensed with.

13. The recording of a copy of a deed in this state, can have no effect.

14. Where any act has been done by the trustees, under a trust deed, it is evidence of an acceptance of the trust.

15. An agency must be proved to bind the parties interested.

16. A trustee is presumed to act for the benefit of his cestui que trust.

17. Under certain circumstances he may convey to an innocent purchaser for a valuable consideration.

18. No greater interest can be conveyed by the grantor than is vested in him.

19. It is said that a deed is to be construed most strongly against the grantor. The reason for this rule is not perfectly satisfactory.

20. In explaining an instrument all the parts of it must be taken together.

21. Less strictness in the description of the property is required in a contract to convey, than in a deed of conveyance.

22. There being no proof of indebtedness by the grantor, the trust deed cannot be held fraudulent.

23. Occasional insanity arising from intemperance, not sufficient to set aside a contract.

[Cited in McMechen v. McMechen, 17 W. Va. 683.]

24. An assignment of a military warrant, under which a claim has been asserted for many years, may be presumed to be genuine, and to have been made for a valuable consideration. After the lapse of nearly half a century, the consideration for such a contract cannot be expected to be clearly established.

25. A deed executed by an executor under a will before the emanation of the patent, can convey no legal title. But if the patent issue in the name of the executor, it operates in favor of the prior conveyance by way of estoppel. And this effect follows, whether the will authorises the executor to convey or not.

26. A warranty is limited by the nature of the estate conveyed. It must have an estate upon which to operate.

27. A deed must have upon its face all the requisites of a valid instrument.

28. Where a deed conveys title, a warranty can never operate by way of estoppel.

29. Where an interest passes under the deed there can be no estoppel.

30. The statute of limitations, under the decision of the supreme court of Ohio, bars the heirs of a non-resident, by an adverse possession of twenty years, during the life of the ancestor. But lapse of time will operate as a bar, against a non-resident, under certain circumstances, although the statute does not run against him.

31. Chancery will always refuse its aid against conscience where the demand is stale and there has been great negligence.

[Cited in Connecticut Mut. Ins. Co. v. Athon, 78 Ind. 17.]

[See Baird v. Byrne, Case No. 757.]

In equity.

OPINION OF THE COURT. In their bill the complainants set up a claim to a certain tract of land, in possession of the defendants, and to which they claim title; and a decree for the title and possession is prayed. It seems that General Robert Lawson, the ancestor of the complainants, having served in the Virginia continental line in the revolutionary war, received for his services a military warrant No. 1721, for ten thousand acres of land; which, before the 4th June, 1794, was located in the Virginia military district, in this state, in tracts of one thousand acres each; under the following numbers of entries. 1704, 1705, 1706, 1707, 1714, 1715, 1716, 1717, 1718, 1719. On the 4th June, 1794, as the bill states, an indenture of three parts was entered into between Robert Lawson of Fayette county, Kentucky, of the first part, Sarah his wife of the second part, and James Speed, George Thompson, Joseph Crockett, and George Nicholas of the third part, which was duly signed and delivered; and which for the considerations therein expressed, conveyed to the

---

[1] [Reported by Hon. John McLean, Circuit Justice.]

said parties of the third part, and to their heirs, executors, administrators and assigns of them, their survivors and survivor, one hundred and fifty acres of land on which Lawson then lived; "also two thousand acres of military land situated on White Oak Creek, on the north west side of the Ohio, being the land mentioned in the first entry made for the said Lawson on the surveyor's books;" and also among other real and personal estate, "five thousand acres of land on the north west side of the Ohio, being part of the land obtained by the said Lawson for his military services, and part of ten thousand acres which have been laid off in lots of one thousand acres each, and being the last entries made in the name of said Lawson." To have and to hold the lands, &c. to them the said James Speed, George Thompson, Joseph Crockett and George Nicholas, their heirs and assigns forever; and to the survivors and survivor of them, their heirs and assigns forever; upon the special trust that they will permit the said Lawson and his wife, and the survivor; and the said Sarah, if she should again separate from her husband, to use, occupy, possess and enjoy during their natural lives, and the life of the survivor, under the exceptions above stated, the one hundred and fifty acres of land in Fayette county, &c.; and that they will convey the same to whom she may appoint, by any instrument of writing under her hand, and attested by one witness, subject, &c., and also that they will "convey the two thousand acres of land on White Oak Creek, to either of the sons of the marriage to whom the said Sarah shall direct; unless the trustees shall judge it proper to dispose of any part or parts of the said tract for the use of the family," &c., and the trustees were authorised to convey, as specified, to the children of the said Lawson, in different parcels, the five thousand acres. And the said Lawson covenanted with the trustees that he would at no future time, "offer any personal violence or injury to his wife, and that he would abstain from the intemperate use of every kind of spirituous liquors, and that if he should any time thereafter again offer any personal violence or injury to his wife, the trustees were authorised to dispossess him of the hundred and fifty acres of land," &c. Entries 1707 and 1714, the complainants aver, covered the two thousand acres conveyed by the above deed; and that the five thousand acres conveyed were covered by entries 1718, 1719, 1704, 1705 and 1706.

On the 16th August, 1796, Lawson made an assignment to one John O'Bannon, of three thousand three hundred and thirty-three and one-third acres, of the part of his warrant which had not been surveyed, for value received. This assignment is charged to have been without consideration, and when the mind of Lawson, by intemperance, was rendered unfit to make a contract, and notice of the trust deed by O'Bannon is averred. That on the 25th August, 1796, O'Bannon, well knowing that the aforesaid entry of 1707, had been conveyed by the trust deed, fraudulently withdrew it, and re-entered, in his own name, 965 acres, under the same number, on the waters of Straight creek. This is the tract in controversy in this suit. O'Bannon having obtained the plat and certificate, deposited them, before the 12th February, 1799, in the department of state, and applied for a patent. That the trustees, by their agent, Joshua Lewis, entered, on the above day, a caveat against the issuing of a patent on this fraudulent proceeding. And afterwards, on the 9th May, 1811, the department of state suspended the further issuing of patents on the warrant of Lawson. Lawson and wife remained together but a short time after the execution of the trust deed. Mrs. Lawson went to Virginia, where she died, in 1809, never having appointed, as provided by the trust deed, to whom conveyances should be made. Lawson, in 1800, was taken to Virginia, and remained in Richmond, supported by charity; his mind and body being in a most deplorable condition, until his death, which took place four years before the death of his wife. In 1800, George Nicholas, one of the trustees, died; and some time afterwards James Speed and Joseph Crockett, also, died; by which the trust estate vested in George Thompson, the survivor, and his heirs. On the 22d March, 1834, George Thompson died, and left George C. Thompson, one of the complainants, his son and only heir at law, in whom the trust estate became vested. Various disabilities, and non-residence, are alleged in the bill, as an excuse under the statute of limitations and the lapse of time. John O'Bannon died in January, 1812, having made a will, and appointed Robert Alexander, Esquire, and George T. Cotten, his son-in-law, executors. And on the 21st of December, 1816, Cotten fraudulently and with full notice of the trust deed, the bill alleges, obtained a patent, from the general land office, in his own name, "as executor of the last will and testament of the said John O'Bannon, in trust, for the uses and purposes mentioned in his will, for the tract of 965 acres." O'Bannon left several devisees, who are not within the jurisdiction of this court.

Some years before the emanation of the patent, Cotten, as executor, conveyed the land to William Lytle, who had purchased it from O'Bannon, in his life time. Cotten died, testate, some time after he obtained the patent. The defendants plead in bar, that they are purchasers from Lytle, and those claiming under him, for a valuable consideration, without notice, and they exhibit their deeds, &c. They also file an answer in support of their plea, in which the fraud alleged in the bill, and all facts going to show equity in the claim of the complainants, are denied. And in an amended answer they set up in bar the statute of limitations and lapse of time. The complainants took issue on the plea, and filed a general replication.

The first question arises on the state of the pleadings. The answer is not only full to the whole merits of the bill, but it sets up new and substantive defences: the statute of limitations and lapse of time. The bar alleged in the plea is a bona fide purchase for a valuable consideration without notice. There is some confusion in the authorities and in the elementary treatises, as to the extent and effect of an answer in support of a plea. In a note in Mitf. 240, it is said, "that in the cases in the court of exchequer, it seems to have been supposed that the answer in support of the plea overruled the plea. But an answer can only overrule a plea, where it applies to matter, which the defendant, by his plea, declines to answer, demanding the judgment of the court, whether by reason of the matter stated in the plea, he ought to be compelled to answer so much of the bill." In such a case, the answer being broader than the plea, overrules it. Story, Eq. Pl. 532. Where fraud is alleged in the bill, it should be denied in the plea, and also in an answer in support of the plea. The complainant is entitled to the oath of the defendant, and if the answer do not deny the fraud, the plea may be overruled absolutely, or only as an immediate bar, saving the benefit of it to the hearing of the cause. Story, Eq. Pl. 536, 537. But the objection here is, that the answer sets up a different defence from that made in the plea. In Story, Eq. Pl. 537, 538, it is said, "if one defence is made by the answer, and another by the plea, the plea will be ordered to stand for an answer.". In such case, the plea is considered as a part of the answer, and, with leave of the court, may be excepted to. Story, Eq. Pl. 543. As the answer in this case brings the plea clearly within the rule stated, it must be considered merely as a part of the answer.

The complainants rest their right mainly on the trust deed; and it is necessary to inquire into the execution and effect of that deed. The ordinance of 1787 for the government of the Northwestern Territory, provides, that "real estate may be conveyed by lease and release, or bargain and sale, signed, sealed and delivered by the person being of full age in whom the estate may be, and attested by two witnesses, provided such conveyance be acknowledged, or the execution thereof duly proved, and be recorded within one year after proper magistrates, courts and registers shall be appointed for that purpose." Under this law, the deed of trust is alleged to have been executed. The provision in the ordinance refers to the legal and not the equitable conveyance of real estate. An equity like the one in question could be conveyed by an assignment on the warrant, or on a separate paper, as well as by a deed containing all the solemnities required by the ordinance. Lawson had only an equitable title arising from entry, to the Ohio lands named in the trust deed. That

deed, if duly executed, conveyed to the trustees the title which Lawson had in these lands; but the character of the instrument could convey no higher or better title than he possessed. The lands in Kentucky and in Virginia, which the deed purported to convey, may have been conveyed in fee; the fee at the time being vested in the grantor. But this can have no effect, either as regards the proof of the instrument in this case, or the interest assigned to the Ohio lands. An individual having merely an equitable interest in land, may convey that interest by a deed duly acknowledged; but such an instrument, not purporting to convey the land in fee, but an equity, is not within the statute or ordinance, and consequently is not proved by an acknowledgment, as a conveyance in fee. Such a deed, if duly recorded, would not be constructive notice under the statute. If a deed on its face purport to convey land in fee, or for a term of years, perhaps, though the grantor has no interest in the land, yet the execution of the instrument may be proved by its acknowledgment. It is within the law, and its signing and delivery are proved in the same mode as an operative instrument.

The land in controversy, it is alleged, is covered by the description in the trust deed of "two thousand acres of military land situate on White Oak creek, on the northwest side of the Ohio, being the land mentioned in the first entry made for the said Lawson, on the surveyor's books." This land the trust deed purports to convey. But how is it conveyed. In fact and in form the equity only is conveyed. It was "all the interest the grantor possessed," and he describes it by a reference to the "entry on the surveyor's books." There is no covenant of seisin, nor any expression in the deed which shows an intention to convey any other interest in the land, except that which resulted from an entry. But if the deed were a conveyance in fee of these military lands, a record of it in Kentucky, though duly certified, would not make the copy evidence in this state. The deed is required to be recorded in this state, after it has been duly acknowledged, and a certified copy of the record thus made is evidence under the statute. The recording of the deed, therefore, in Kentucky, if clearly shown, would not make either a certified or sworn copy from the record evidence. The original being lost, a sworn copy of it is the next best proof.

From the depositions of Fielding L. Turner, and others, there is reasonable proof of the loss of the original trust deed. The recorder's office where it was deposited for record was burnt before 1806, and it is highly probable that that deed, with many others, was destroyed. The above witness was deputy clerk in the office where the deed was deposited, and he states that he saw the original deed, which was in the hand writing of George Nicholas. He says the parties to

that deed, and the witnesses, are now dead. A copy of the deed in the hand writing of Colonel Nicholas is in evidence, and it agrees substantially with the deed which has been copied from the Fayette records. That deed, from the records of the Fayette county court, appears to have been acknowledged and proved by the subscribing witnesses, before it was recorded. Lawson's letters refer to the deed, and also the letters of George Nicholas, one of the trustees. These and other references are not only to the existence of the deed, but to an important part of its contents. A copy of the deed was filed in the department of state, at the time the caveat was entered. It has now been nearly half a century since the deed purports to have been executed. The evidence does not come strictly within any of the defined rules, as to the proof of lost instruments; but we think the facts and circumstances adduced create a strong probability that the deed was executed; and that its contents are truly stated in the copies certified. No effect can be given to the record of the deed in Hamilton county, of this state. That record was made, not from the original deed but a copy, and consequently the record is invalid for any purpose. It does not appear at whose instance this copy was recorded. Did the trustees accept the trust. As their signatures were affixed to the trust deed, the presumption is that they did. At least they co-operated in the execution of the deed from which their powers were derived. And in a letter to Gen. Lawson, dated nearly two months after the trust deed was executed, George Nicholas, one of the trustees says, in reference to a proposition to sell two thousand acres of the Ohio lands, in the trust deed, "if I had it in my power and was ever so well disposed to do it, I should only have one voice in four as to the disposal of the 2000 acres of land, which is all that the trustees have any power over." "It is my opinion that it ought by no means to be applied to answer current expenses, because if it is, it must necessarily soon be exhausted; but that when the title is completed, and the value of the land increased, that it may be sold," &c. And he says "I will show your letter to the other gentlemen." From this it would seem that the writer not only recognised the trust, but so far as his advice would go, acted under it. And he promises to show the letter to the other trustees. But beyond this, there is believed to be no evidence that the trustees acted under the deed. Lewis represented himself as the agent of the trustees, in entering the caveat in the department of state. But there is no evidence of this agency. James Speed, one of the trustees, states that "the caveat entered in his name and others, as trustees of Gen. Lawson, against issuing of grants, &c., had been entered without his knowledge or consent. That he never did act or intended to act as trustee." The consideration named

in the trust deed was, that the wife of Lawson consented again to live with him, and also that she and George Nicholas consented to release him from his covenants in a certain deed previously executed, and in consideration of five shillings," &c.

The principal object of the trust deed was, to procure a reconciliation between Lawson and his wife, and preserve harmony in the family. But it seems that this effort, like the previous ones, proved abortive. In a short time the parties again separated, and Mrs. Lawson went to Virginia. From the time of this separation it does not appear that either the trustees, General or Mrs. Lawson, took any action under the trust deed. The great object of the deed having failed, it seems to have been lost sight of by all the parties to it. As the act of Lewis, in entering the caveat, has been disavowed by one of the trustees, their authority to do the act cannot be presumed. But it is insisted that the trust having vested, the neglect or unfaithfulness of the trustees shall not prejudice the cestui que trusts. The estate having passed by the trust deed, cannot be divested, except by an instrument of equal solemnity. Except where the trustee conveys the estate to an innocent purchaser for a valuable consideration, without notice of the trust, it is a well settled principle, that he can do no act to the injury of his cestui que trust. If he sell the estate the cestui que trust may set aside the sale, demand the purchase money or claim the property, to the purchase of which, the money may have been applied. And the principle is also clear, that where an estate is conveyed in fee, the destruction of the deed or any other act, short of a reconveyance, cannot revest the title in the grantor. But how does this doctrine apply to the case under consideration. No fee was conveyed by the deed of trust, as regards the Ohio lands. A mere equity was all that Lawson possessed, and, consequently, all that the deed could pass. Its mode of transfer was not regulated by statute. It could be assigned by the trustees, or reassigned by them to Lawson, by writing, in any form which the parties might choose; or, there being no statute of frauds, by a parol contract. This equitable title, then, which vested in the trustees, under the deed, is not governed by the principle of law adverted to. That principle applies exclusively to a conveyance of the legal title. The deed of trust describes the land as "two thousand acres of military land, situate on White Oak creek, on the north-west side of the Ohio, being the land covered by the first entry on the surveyor's books," &c. Now, it does not appear that Lawson had any lands situated on "White Oak creek," as here described. At least, it very clearly appears, that the land claimed by the defendants, is not on or near "White Oak creek;" nor is there an entry of Lawson for two thousand acres. And on this

ground, the defendants contend, that the land described in the deed, is not the land claimed by them.

There is no rule, in favor of which a greater number of authorities may be cited, than that a deed is to be construed most strongly against the grantor. The reason is, that the person who makes the conveyance, is presumed to weigh and fully comprehend the words used in it. This rule has always appeared to me, to be better sustained by authority, than by sound reason. I cannot see why a deed of conveyance should receive a different construction, from any other instrument under seal. In England, the deed is prepared by the grantee. In this country, the practice is, generally, different. The intention of the parties, both as to the interest conveyed, and the property, is to be ascertained by the language of the instrument. It must be looked at in all its parts, as one part may explain another. If there be a latent ambiguity, it may, in most cases, be explained by parol; but if the uncertainty arise upon the face of the deed, it cannot be explained. It would be difficult to sustain the trust deed, as a conveyance of the Ohio lands, in fee simple. To do this, proof must be made that Lawson had no other military lands north-west of the Ohio, except those located under his warrant for ten thousand acres. And as the entries under that warrant were made for separate tracts, of a thousand acres each, and the deed is for two thousand acres, "being the land mentioned in the first entry made for the said Lawson, on the surveyor's books," it must be proved that by the word, entry, entries were meant. This would be to introduce parol proof, as regards the situation of the land and the description of the title, in contradiction of the deed. It is believed that no case can be found to sustain this proof. But, it is unnecessary to decide this particular question. As regards the land in controversy, the trust deed cannot be considered as conveying any thing more than a simple equity. And in the relation it bears to the present suit, it may be regarded as a contract to convey, rather than a conveyance in fact. In the bill the complainants set out the description of the title, and the situation of the two thousand acres of land, as given in the deed, and aver that it is the same land as covered by entries, Nos. 1707 and 1714. And other circumstances are referred to in the bill, which conduce to sustain this averment. At the time this equity was assigned to the trustees, the situation of the land must have been imperfectly known by Lawson. The country where it was located, was new, and but little explored except by surveyors; and it is not probable that Lawson had been on the ground. The books of the principal surveyor afford evidence of no entries made in the name of Lawson, except by virtue of the warrant for ten thousand acres. And the same instrument conveys to the trustees "five thousand acres of land on the north-west side of the Ohio," "being part of the land obtained by the said Lawson for his military services, being part of ten thousand acres, which have been laid off in lots of one thousand acres each," &c.; from which there would seem to be little doubt, that the tract of two thousand acres intended to be assigned, was located under the above warrant. Indeed, it is probable that the word entry, instead of entries, was an error of the draftsman of the deed. . It is the province of a court of equity to relieve from accident or mistake, and give effect to the intention of the parties. Upon the whole, without going into a detailed consideration of the facts and circumstances relied on by the complainants, we are brought to the conclusion, that the averments in the bill, as to the location of the two thousand acres, are sustained; and that on principle, viewing the bill as setting up an equity against the defendants, the evidence is admissible. From the foregoing considerations, the trustees must be held as vested with the equitable title to the land in controversy, for the purposes specified, the 4th June, 1794, when the trust deed was executed. There is no proof of indebtment by Lawson, which can make the trust deed void, as against creditors.

The title set up by the defendants, will be now examined. The defendants' title originated by an assignment of 3,333⅓ acres of his warrant, the 16th August, 1796, from Lawson to O'Bannon. This assignment is charged to have been made fraudulently, and without consideration.

A great number of witnesses have testified as to the habits of Gen. Lawson. It seems he was intemperate before he left Virginia, and that this habit became much worse in Kentucky. Indeed some of the witnesses say that his indulgences in this way were so excessive, as to render him unfit to transact any kind of business. That after the last separation from his wife, he seemed to lose all respect for himself, his family and society. That he became utterly degraded, the associate of slaves; and was seen in the streets of Lexington imploring money from every person he met with to purchase spirits. Other witnesses speak of him as always intoxicated when he had the means of becoming so, but that when sober, which was sometimes the case, he was capable of transacting business. He was a lawyer by profession, and occasionally, as well after his removal to Kentucky as before it, was engaged in the practice of law. Daniel Feagins was an attesting witness to the assignment to O'Bannon. He has since died, but his hand writing is proved by his sons, Fielding Feagins and Edward. They both state that General Lawson was at their father's near Germantown, Mason county, Kentucky, a part of the summer of 1796. And the former, who is the elder, says that General Lawson, at that time, when sober,

was of a sound mind and capable of doing business of any kind. James McKinney, a witness, who in 1796 lived on the farm of Daniel Feagins, and in the summer of that year saw General Lawson at his house, says that when Lawson was sober he appeared to be a sensible, intelligent man, of good education. That he never saw or heard of any thing to induce him to believe that Lawson was not as capable of transacting business, as any other man. The attempt to prove his insanity, about the time of taking the deposition of the witness, was the first intimation he ever had on the subject. Fielding Feagins also states that about forty years ago or upwards, he made a trip with General Lawson and his father to Louisville. They embarked in a small family boat at the place now called Maysville, putting their horses on board, and landed at the falls on the fourth morning after their departure. Their business, he says, to Louisville, was, to get a title to a piece of land purchased of Lawson, situated, now, in Brown county, Ohio. During their trip they had no spirits on board—General Lawson was perfectly sober; in good health and capable of doing any business. It is probable the assignment to O'Bannon was made at Louisville, as an assignment was made on the same day by Lawson to Daniel Feagins, of two thousand acres of the same warrant, to which Richard C. Anderson, the surveyor, who resided near Louisville, was an attesting witness. This fact is presumptive evidence that on the 16th August, 1796, Lawson was not deemed, by the surveyor, unfit to do business. Philemon Thomas, a witness, states, that Lawson came to his house in 1795, 1796 or 1797, and offered to sell his military lands in Ohio; but the witness "refused to buy them, or to make any bargain with him, as he appeared to be insane." A short time afterwards the witness states there was a report in the neighborhood, that Daniel Feagins had purchased the lands.

On looking into the whole evidence, and weighing it maturely, the fact of Lawson's insanity, at the time of the assignment, seems not to be established. When intoxicated he was undoubtedly incapable of transacting any business; and it is probable that he was intoxicated the greater part of the time in the summer of 1796. But when sober he was capable of business, and it appears from the statement of Fielding Feagins, that he was not intoxicated, and had not been for several days preceding the assignment of the two thousand acres to his father, which was witnessed by Anderson. As before remarked, the assignment to O'Bannon was made on the same day. Fraud will not be presumed, though it may be proved by circumstances. But the circumstances in this case do not authorise an inference of incompetency on the part of Lawson to make the contract of assignment. Indeed the weight of evidence, as also the presumption

of law, is against the position of the complainants. The attempt to discredit the Feagins's by proving their conversations about the time their depositions were taken, and to show that Lawson was not at the house of Daniel Feagins, in the summer of 1796, as sworn by them, cannot, materially, affect their credibility.

Was the assignment to O'Bannon made without consideration. In his letter to the Honorable Thomas Todd, filed in the general land office, O'Bannon alleged that he made the original entries under Lawson's warrant, and that that was the consideration on which he obtained the assignment for 3,333⅓ acres. The books of the principal surveyor do not show by whom these entries were made. But from an old file of orders for locations found in the surveyor's office, it appears that O'Bannon gave orders for the entry of numbers 1704, 1706, and 1707, as originally made. On the books, however, his name was not entered as the locator. It seems not to have been the practice at that time to state by whom the entry was, in fact made. In a letter from General Lawson, dated Richmond, 27th June, 1788, to the principal surveyor, he says, "I have waited with anxious expectation to hear from you on the subject of my land warrant put into your hands by Col. Ed. Corrington." "Gen. Stevens tells me he has lately received a letter from you, whereby you inform him, that you must receive either so much cash, or a third of the land for surveying," &c. "I think a third very high, but under the scarcity of money at this day, I must prefer it to the demand in cash."

A certificate is offered in evidence which purports to have been signed by Lawson, and dated at Richmond, 27th November, 1802, which states that Major John O'Bannon was the locator of his military land, and that, "by prior contract he was to have one third of ten thousand acres for his services," &c. To this certificate the names of two witnesses were signed. Bootwright, one of the witnesses, swears that he never subscribed the paper as a witness, and the other witness is dead, but there is no attempt to prove his hand writing. This certificate is not proved to be genuine, and, consequently, it cannot be considered as in evidence. On the 30th of July, 1794, in a letter to Colonel Nicholas, General Lawson says, "by the enclosed letter from Colonel Anderson, I am informed that the expenses attendant on the two surveys of one thousand acres each, amount to eight pounds fourteen shillings and sixpence, which he also informs me it is necessary should be paid previous to the delivery of the plats." And he further remarks, "as I have it not at present in my power to advance that sum in money, I should esteem it as a singular favor if you could accommodate the matter with him, and take out the plats," &c. "From what Mr. Massie informed me, I have much reason to

believe that more land of my ten thousand acres north-west of the Ohio, hath been surveyed than has been returned and recorded in the surveyor's office, owing to Mr. Fox's death shortly after his return from his last surveys in that quarter. But of this I expect to receive particular information shortly," &c. He proposed to authorise Col. Nicholas to sell some of his lands to indemnify himself, should he advance the money. In his answer, Col. Nicholas declines making an advance, but promises to write to Col. Anderson, the surveyor, that if he will forward the plats, he would become ultimately responsible for the money. There is no evidence of the payment of the above sum to the principal surveyor. The letter of Lawson has undoubtedly a strong bearing against the truth of the certificate overruled, and also against the assertion of O'Bannon to the general land office, that he was the original locator of the warrant. But the letter states no fact incompatible with the assertion of O'Bannon. It refutes by inference the allegation that the entries and surveys were made by him under a prior contract, for one-third of the land. For if such a contract had been made, Lawson would have referred to it; as it can scarcely be supposed that he would have forgotten it. The reference to the return of Fox, and his decease, would seem to create some doubt whether he might not have made some of the surveys. There is nothing, however, specifically stated on the subject. In the absence of positive proof, our conclusion on this point must rest on circumstances. Lawson, in his letter to Col. Anderson, proposed to give one-third of the land called for by his warrant, for locating and surveying it, rather than a money compensation. It is proved, positively, that O'Bannon made three of the original entries in 1788. And it is a strong fact that one-third of the warrant was assigned by Lawson to O'Bannon. In all probability, this assignment was made at the land office, in the presence of the principal surveyor. The assignment made to Feagins on the same day, as before remarked, was witnessed by Col. Anderson. In his official capacity he recognized the right of O'Bannon, under the assignment, a few days after it was made. That Lawson was competent to make the assignment, we have already decided.

Now, in view of these facts, where does the probability lie? From the circumstances of Lawson, it is not probable that he advanced the money. There is no evidence that any one else advanced it for him. He preferred giving one-third of the land to a payment in money; and so stated in his letter to the principal surveyor. And he did transfer to O'Bannon one-third of his warrant. On the same day, Lawson receipted to Col. Anderson for a plat and certificate of two thousand acres of his Ohio military land. Since the assignment, nearly half a century has elapsed. The actors are all dead. Un-

der such circumstances, can positive evidence of the payment of a consideration be reasonably expected. The assignment upon its face is fair, and it purports to have been made for value received. Since it was made, O'Bannon, and those who claim under him, have continually asserted their claim. In an ordinary case, the assignment alone would be satisfactory. But in this case there is more than a presumption resting on the assignment itself. Its validity is sustained by several leading circumstances. The answer which, in this respect, is responsive to the bill, declares that the assignment was made on a good and valuable consideration. The complainants impeach it on this ground, and to set it aside they must impeach it by evidence. That this point is not clear of doubt is readily admitted; but looking at the case as shown by the evidence, connected with the lapse of time, we are brought to the conclusion that this assignment is not void for want of a consideration. That a consideration was paid is shown in a clearer point of view than could ordinarily be expected, in so remote a transaction.

But it is contended that if the assignment were bona fide and for a valuable consideration, that it did not cover the land in controversy. And that it was a fraud in O'Bannon to withdraw the entry 1707, made in the name of Lawson, and re-enter it in his own name. The assignment to O'Bannon purports to be of that part of the warrant to be surveyed. All the entries had been made long before the assignment, but what part of them had been surveyed is not shown. By the assignment, O'Bannon had a right to one-third of the entries made, and might, in the exercise of his discretion, withdraw any of them, not exceeding his claim, and re-enter them in his own name. He was limited to the entries not surveyed; but it does not appear that entry 1707 had been surveyed. It appears that on the 25th August, 1796, nine days after the assignment, O'Bannon having withdrawn that entry, he re-entered nine hundred and sixty-five acres under the same number in his own name, on the waters of Straight creek. If entry 1707 had been surveyed, it is not perceived, from the evidence in the case, how that fact could affect the defendants. On the 4th January, 1812, O'Bannon sold the entry 1707 and survey of nine hundred and sixty-five acres, as the answer alleges, for a valuable consideration, to William Lytle, and gave him a bond for a general warranty deed. In the early part of 1813, O'Bannon died; having made a will and appointed Robert Alexander and George T. Cotten his executors. The will was proved before the county court, of Woodford, Kentucky, at April term, 1813; and bond having been given by Cotten, he was duly qualified as executor. The other executor did not qualify. Cotten, as executor, on the 16th of July, 1813, conveyed to Lytle, by a deed of general warranty, the above land, and on the 21st of

the same month and year, Lytle sold the land to Samuel McConaughy, and executed to him a deed of general warranty. From McConaughy deeds were ·executed to the other defendants, or to those through whom they claim, at different times, for parts of the same tract. On the 21st of December, 1816, Cotten obtained from the general land office the patent for the nine hundred and sixty-five acres in his own name, as "executor of the last will and testament of O'Bannon, deceased, and to his heirs in trust for the uses and purposes mentioned in the will, &c."

It is contended that the patent was fraudulently obtained by Cotten. But fraud is not proved. The caveat had been entered by Lewis, as the agent of the trustees, but as it now seems, without any authority on their part; and on investigation the patent was issued after it had been suspended for many years. No step seems to have been taken by the trustees to procure the patent in their own names in trust, or to prevent its being ·issued to Cotten.

The deed from Cotten to Lytle, it is contended, as a conveyance, was wholly inoperative and void. At the time that deed was executed the fee of the land was in the government; and of course it could not be conveyed by the deed. But the year before its execution McConaughy took possession of the land as purchaser from Lytle, so that there was not only no adverse possession at the time the deed was executed, but the possession was under the right intended to be perfected by the deed. It must be admitted that the will of O'Bannon does not specially authorise his executors to convey land, which he had previously sold. The words of the will are, "all other property as above mentioned, (including lands) to be sold and settled by my executors, with power to collect, sue, &c." O'Bannon's will was not proved and recorded in this state, as required by the 12th and 13th sections of the act of the 10th February, 1810, which gives effect to wills made out of the state, relating to real property within it.

The other objection to this deed, that the conveyance was by one executor, when two were appointed, it is unnecessary to examine; as the will gave no authority to convey the land in question. Although the deed of Cotten, when executed, did not operate as a conveyance of the land, yet it is contended that as the patent was subsequently issued, effect by way of estoppel was thereby given to the general warranty in the deed.

On the part of the complainants it is contended, that the deed being void and inoperative, as a conveyance, the covenant of general warranty annexed to it, is also void. Co. Litt. 365a. That a warranty must have an estate whereupon it may work in the beginning. Co. Litt. 378a. 4 Cruise, Dig. 294, § 16, pt. 3. That a warranty doth not give a right, but bindeth only a right so long as the same continueth. Co. Litt. 272a. That a war-

ranty itself cannot enlarge an estate. Co. Litt. 385b. That a warranty ceases on the expiration of the estate to which the warranty is annexed. Co. Litt. 378a, note 1. That the estate being avoided, the warranty annexed to it is also avoided. ·Co. Litt. 366b, 367, 368a, 389a. From the view which the court have taken of this case, it is not essential that the doctrine of estoppel should be examined. But as much research and learning have been shown in the argument of the complainants' counsel, it may not be improper to consider the points above stated. That a warranty is limited by the nature of the estate conveyed, is unquestionable. And also that a warranty in a deed, void upon its face, is void. The warranty must have an estate upon which it ·is to operate, and a deed which does not purport to convey such an estate, though it contain a warranty, can never operate by way of estoppel. What is warranted? The title set out in the deed. And the deed must have upon its face all the requisites which the law requires. To make a valid conveyance under our law, the deed must be ·sealed, and have two subscribing witnesses, &c.

The argument of the complainants is, that unless the deed operate as the transfer of some title or interest when executed to feed the ·warranty, it is no estoppel. Now the converse of this position is the true one. Where a deed does convey title, the warranty can never operate as an estoppel. In 4 Cruise, Dig. 270, §§ 58, 59, it is said, "When an interest actually passes by a lien, there is no estoppel." "For the reason why estoppels were at any time allowed was, because otherwise, when the party had nothing in the lands, the deed must be absolutely void." 2 Co. Litt. 293, it is said, "that upon every conveyance of lands, tenements, or hereditaments, as upon fines, feoffments, gifts, &c., releases and confirmations made to the tenant of the land, a warranty may be made, albeit he that makes the release or confirmation, hath no right to the land, &c.; but some do hold, that by release or confirmation, where there is no estate created or transmutation of possession, a warranty cannot be made to the assignee." In note E, it is observed, "but the law is otherwise; for if A be seised of lands in fee, and B release to him, or confirm his estate in fee with warranty to him, his heirs and assigns, this warranty is good, and both the party and his assignee shall vouch." In the same book (page 486) it is said, "If the lease be made by deed indented, then are both parties concluded; but if it be by deed poll, the lessee is not estopped to say that the lessor had nothing at the time of the lease made." And under note L, "leases by estoppel are such as are made by persons who have no interest at the time, or at least no vested estate, but are to operate on their ownership, when they shall acquire the same." "And wheresoever any interest passeth from the party, there can be no estoppel against him."

Co. Litt. 505. This doctrine is found in 4 Kent, Comm. 98. "Leases may operate by estoppel when they are not supplied from the ownership of the lessor, but are made by persons who had no vested interest at the time." "But if the lease takes effect, by passing an interest, it cannot operate by way of estoppel." "The deed which creates an estoppel to the party undertaking to convey or demise real estate, when he has nothing in the estate at the time of the conveyance, passes an interest or title to the prior grantee, or his assignee, by way of estoppel, from the moment the estate comes to the grantor." "The estoppel works an interest in the land." "An ejectment is maintainable on a mere estoppel." And again, in the same volume, 448, Sir William Blackstone says, "that it prevails, (viz. that land cannot be conveyed while possessed adversely) in the code of all well governed nations;" for possession is an essential part of title and dominion over property. "As the conveyance in such a case is a mere nullity, and has no operation, the title continues in the grantor, so as to enable him to maintain an ejectment upon it; and the void deed cannot be set up by a third person to the prejudice of his title. But as between the parties to the deed, it might operate by way of estoppel and bar the grantor. This is the language of the old authorities, even as to a deed founded on champerty or maintenance." Co. Litt. 369. Lord Hardwicke says (1 Ves. Sr. 230), "a fine though it pass no estate estops the heir."

Lytle having purchased the land from O'Bannon, in his life time, and Cotten having obtained the patent, in his own name, as executor of O'Bannon, "in trust for the uses and purposes mentioned in the will," &c. there would seem to be no doubt that Cotten held the land in trust for Lytle, or those to whom he may have transferred it. There was no mention in the will, of this land, nor any trust created respecting it; nor, as before remarked, was there any general authority given to the executors to convey it. But by the act of the government, in issuing the patent, the trust became vested in Cotten, and his obligations arose, not from the will of O'Bannon, but from the patent. His being named as executor, and the reference to the will in the patent, may be rejected as surplusage or considered terms of description. He held the land in trust for those who were entitled to it. Of this there can be no doubt. And as a conveyance had been made by Cotten to Lytle, before the emanation of the patent, no reason is perceived why the warranty in such deed should not operate as an estoppel against Cotten and his heirs, and the heirs of O'Bannon. If Cotten were now living, and refused to convey the title to Lytle, or his assignees, a court of chancery would compel him to do so. In making the conveyance, then, he only did what equity would have required him to do, after the emanation of the patent.

The defendants rely upon the statute of limitations and lapse of time. In the case of Whitney v. Webb, 10 Ohio, 513, also in the case of Ridley v. Hettman, Id., 524, the supreme court held, that accumulative disabilities could not be set up under the statute. The court say, "the death of a person while laboring under disability, is entirely unprovided for." "The only alternative then, to which we can cling, is to say that such person stands upon the same footing as residents of the state, and that the lapse of twenty years from the time the cause of action accrued will be a bar to the assertion of the right. To say that it shall be twenty years from the death, will be going even beyond the statute of James, in which express provision is made for extending the period, not however to twenty, but only to ten years; and without which provision this advantage could not by construction have been given to the heir." Had these decisions not been made, I should have inclined to the opinion, that as the statute had not run or begun to run in the life-time of the ancestor, though the cause of action had arisen, the land descended to the heir unaffected by the statute; and that accumulative disabilities would be guarded against by holding, that the heir, though laboring under disability, was bound to bring his suit within twenty years. But it is not for this court to say whether the construction of the statute conforms to their views or not; it has been settled by the proper tribunal, and has become a most important rule of property; and as such we must regard it. Now the land in controversy has been held adversely by McConaughy and those who claim under him, since July, 1813, the date of Lytle's deed. All the defendants hold under deeds duly executed; and whether we date their adverse possession on the land in controversy, from Lytle's deed, or the emanation of the patent to Cotten, it is equally clear that they are protected under the above construction of the statute. That statute bars the complainants, whether their right is represented, by the heir of Thompson, the last survivor of the trustees; or by themselves under the trust deed; or as heirs of General Lawson. Had the statute of limitations remained open for our construction, and we construed it as above intimated, which would not bar the complainants' right; still I should have been clearly of the opinion that they were barred by the lapse of time.

The counsel for the complainants have argued that a court of equity can never give effect to the lapse of time, except in a case where the statute would bar an action at law. That time must always be applied by analogy to the statute; and that this analogy would be destroyed, if equity should give a greater effect to time, than could be given to it under the statute. And the case of Larrow v. Beam, 10 Ohio, 498, is relied on as sustaining this position. The court in that case say, "We do not know that there is any

case in which the defence has been distinctly placed upon this ground, (lapse of time) where there was a statute of limitations in force applicable to the case." "If the party be guilty of such laches in prosecuting his title as would bar him, if his title were solely at law, he shall be barred in equity. But farther than this the courts have not ventured to go." That statutes of limitations are binding on a court of equity, as they are on a court of law, is undoubted. In these cases equity may be said to follow the law. But there are many cases in which lapse of time will constitute a bar in equity, though at law the statute would not bar. The statute does not apply to the peculiar facts and circumstances of these cases. In 2 Story, Eq. Jur. 735, it is said, "a defence peculiar to courts of equity, is that founded upon the mere lapse of time, and the staleness of the claim, in cases where no statute of limitations directly governs the case. In such cases courts of equity act sometimes by analogy to the law; and sometimes upon their own inherent doctrine of discouraging, for the peace of society, antiquated demands, by refusing to interfere, where there has been gross laches in prescribing rights, or long and unreasonable acquiescence in the assertion of adverse rights." In Smith v. Clay, 3 Brown, Ch. 640 [note], Lord Camden said, "A court of equity which is never active in relief against conscience, has always refused its aid to stale demands, where the party has slept upon his right and acquiesced for a great length of time. Nothing can call forth this court into activity, but conscience, good faith and reasonable diligence." In Cholmondeley v. Lord Clinton, 2 Jac. & W. 141, Sir Thomas Plumer said, "In courts of equity of this country the principle has been always, as I shall hereafter show, strongly enforced. They have refused relief to stale demands, even in cases where no statutable limitation existed; and wherever any statute has fixed the period of limitations, by which the claim, if it had been made in a court of law, would have been barred, the claim has been by analogy confined to the same period in a court of equity." And again he says, "courts of equity have at all times, upon general principles of their own, even where there was no analogous statutable bar, refused relief to stale demands," &c. Where the statute applies, it is binding on a court of equity, but in cases where the statute does not apply, the court acts upon its own principles. In Piatt v. Vattier, 9 Pet. [34 U. S.] 413, the statute of limitations was insisted on in the argument, but was not set up as a defence in the answer as was lapse of time. And the court held that as the statute was not pleaded they could not notice it, and decided the case against the complainant on lapse of time. In that case the evidence did not show that Bartle, the assignor of the complainant, had been within the state. so as to bring him within the statute; and if the statute had been

pleaded, there can be no doubt that the decision would have been the same as was given. It was a case in which the court was asked to decree a conveyance on a doubtful equity, where there had been an adverse possession of more than thirty years. And yet the person through whom that equity was desired, was not proved to have been within the state during the adverse possession. The statute did not apply in such a case, and yet can any one doubt that the right asserted had become stale, and that relief was properly withheld? It does by no means follow that the court must decree a title, where the statute of limitations does not bar. And yet this would seem to follow, from the argument of the counsel. The case under consideration may strongly illustrate the principle. In June, 1794, Gen. Lawson, with the view of procuring a re-union with his wife, conveyed the equitable title to the land in controversy, and other real and personal estate to trustees, for the benefit of his wife, and under certain conditions, subject to her final disposition. The deed was executed, with the assent of the trustees, and some advice was given by one of them as to the disposition of a part of the land named in the deed; and there is no other positive evidence of any further action of the trustees.

On the strength of the above deed, Mrs. Lawson and her daughter returned to live with her husband; but in a few months, of choice or of necessity, again abandoned him. Some two years after the execution of the trust deed, Lawson assigned the land in controversy to O'Bannon, which he afterwards sold to Lytle. In 1797, Lewis, as agent of the trustees, though as appears without their authority, entered a caveat in the department of state against issuing a patent on Lawson's assignment, for any of the lands included in the trust deed. O'Bannon died, and his executor executed a deed to Lytle for the land, and he conveyed to McConaughy. In 1816, Cotten, as executor, obtained the patent. Since, and indeed before eighteen hundred and thirteen, possession was taken of the land under Lytle. It has been made valuable by numerous farms having been opened on it, dwelling houses erected, and by orchards and other improvements; and now this trust deed is set up against the title of the occupants. The object of the deed having failed, it seems to have been abandoned by all the parties to it. They have all gone to their account. No action under the deed—except what has been stated, and recording a copy in Hamilton county, of this state, at whose instance does not appear—has been had, until the institution of this suit. And is this an equity to be enforced against the title of the defendants—an equity which has been permitted to lie dormant for nearly half a century —an equity which was founded upon the consideration named, and which, in a few months, entirely failed? There is no evidence that the defendants had notice of this claim

until long after their titles were perfected. Possession has been held of the land twenty-nine years, twenty-seven of which elapsed before this suit was commenced. I am aware that circumstances may prevent the effect of time on an equity asserted; and the court should always regard the excuses for a want of diligence. But in the present case no sufficient excuse has been alleged. Some doubt may well be entertained whether the trust deed, having failed in its object, and no appointment under it having been made by Mrs. Lawson, could be carried into effect, if no adverse title could be set up against it. Under the facts and circumstances of the case, the court think the complainants are barred by the lapse of time. And I should be clearly of this opinion, if the statute interposed no legal bar. The bill must be dismissed.