Fisher *v.* The People.

WESLEY B. FISHER, Plaintiff in Error, *v.* THE PEOPLE, Defendants in Error.*

ERROR TO LASALLE.

Every man is presumed to be sane, until the contrary is shown.

In capital cases the jurors are judges of the law and the facts, and are not bound by the instructions of the court.

An expression to the jury indicating an opinion that the prisoner is a guilty person, by the Judge, will be a proper reason for granting a new trial.

If a jury, in such a case, after having retired, comes into court for further instructions, which are given, the prisoner has a right also to have instructions on his part.

Jurors should not separately communicate to or with the court, in writing or verbally, in reference to any matter belonging to the case; they should be brought before the court in a body.

THIS was an indictment for murder, charging the plaintiff in error with killing his wife, Clarissa B. Fisher, on the 18th day of July, 1859.

A witness for plaintiff in error was called, and plaintiff in error offered to prove by her and by several others the infidelity of deceased, to which the counsel for the People objected; the court sustained the objection, and the plaintiff in error excepted.

Said Fisher, by his counsel, offered in evidence Chitty's Medical Jurisprudence, Shelford on Lunacy, Beck's Medical Jurisprudence, Taylor's Medical Jurisprudence, and Wharton's Medical Jurisprudence, for the purpose of throwing light on the indications or symptoms of insanity. The court refused to admit them in evidence, and the prisoner, by his counsel, excepted.

*Solomon Sherwood* called and sworn, and said prisoner offered to prove by said witness that after the marriage of prisoner and deceased, and before the killing, the gross misconduct of deceased was a common subject of conversation among Fisher's acquaintances. People objected, and court sustained the objection. Exception by Fisher.

*David Strawn* called and sworn on the part of the People, and allowed by the court to testify that Fisher was a profane man in 1850, to which evidence the prisoner objected; the court overruled the objection, and the prisoner excepted.

The 4th instruction given for the People is as follows: The law presumes every man to be sane until the contrary is shown, and when insanity is set up as a defense, by a person accused of crime, the jury should be satisfied, from all of the proofs in the

* This case was heard at April term, 1860, in the Third Grand Division.

case, that at the time of the commission of the crime his mind was so far affected with insanity as to render him incapable of distinguishing between right and wrong, in respect to the killing, or if he were conscious of the act he was doing, and knew its consequences, he was, in consequence of his insanity, wrought up to a frenzy which rendered him *unable* to control his actions or direct his movements.

5th.   In arriving at the conclusion whether the prisoner was sane or insane, at the time of the killing, the jury should begin with the presumption of the prisoner's sanity, and take into account all · the evidence in the case of his previous history, habits and conduct, the circumstances immediately connected with the act of killing and his subsequent conduct and deportment, and unless the evidence preponderates in favor of his insanity at the time of the act, the jury cannot excuse the prisoner on the plea of insanity.

6th.   Even if there should be evidence tending to show that the prisoner was insane, or affected with insanity previous to the act of killing, yet the question for the jury on this point is, whether he was insane at the time of the act complained of, and unless the jury are satisfied, from *all* the proof in the case, that the prisoner was insane *at the time of the act of killing*, they should not excuse him on that ground.

7th.   Before the jury can be justified in rendering a verdict of acquittal on the ground of moral insanity, they must be satisfied by *clear* and *undoubted proof* that the accused was acting under an uncontrollable impulse, a frenzy which rendered him unable to control his actions or direct his movements, and not in a spirit of revenge for real or imagined wrong.

9th.   The prosecution are not bound to prove that the defendant was sane at the time of the act complained of, and if the whole evidence in the case should leave it doubtful in the minds of the jury whether the prisoner was sane or insane at the time, they should not in that case excuse the prisoner on the ground of insanity.

Instructions asked for defendant :

1st.   Crime by the statute of this State is declared to be a joint operation of act and intention or criminal negligence ; and whether there was or was not intention on the part of the prisoner to commit the act complained of, must be determined by all the facts and circumstances connected with the case, and the condition of his mind at the time of the killing ; and if the jury believe, from the evidence, that at the time of the killing the mind of the prisoner was affected with insanity, there could not have been a such joint operation of act and intention as would in the eye of the law make him guilty of murder.

Fisher *v.* The People.

Which the court qualified as follows : Yet the fact that the mind of the prisoner, accused of crime, was affected with insanity, would not of itself excuse the commission of crime.

3rd. If the jury believe, from the evidence, that at the time of the killing, the mind of the prisoner was affected with insanity to such an extent that he was impelled to kill by an insane and irresistible impulse, over which his mind had no controlling power, it is the duty of the jury to acquit him, and it is entirely immaterial whether such insane mental condition was constitutional, or whether it was produced by jealousy or any other cause.

Which was qualified by the court as follows : Before the jury can acquit the prisoner on the ground of insanity, they must believe, from the evidence, that at the time of the killing he was in a condition of insanity ; that his insanity was of such a character that he did not understand the nature, quality and character of the act he was committing ; or that knowing it, he was acting under such an impulse of passion or insane desire to kill, as to exempt him from the dominion and control of reason. In order for the jury to acquit on the latter ground, they should be satisfied, from the evidence, that this insane desire was of a character that inclined the prisoner to acts of homicide, that is, that it was evinced in attempts at killing in more than a single instance, and must be made to appear in more than the single act of killing the deceased. If it do not appear in the manner stated above, it must be shown by facts and circumstances contemporaneous with the killing, or the existence of an habitual tendency developed in previous cases, becoming in itself a second nature.

The 4th instruction asked for the prisoner, and refused by the court, was and is as follows : Although the prisoner may not have been so insane as to excuse him entirely, yet, in determining whether at the time of the killing he acted without deliberation, and under the influence of such a sudden and irresistible passion as would reduce the grade of the offense from murder to manslaughter, it is proper for the jury, if they believe that the same provocation would arouse such a sudden and irresistible passion in his mind, if so affected by jealousy, when it would not have aroused it if he had not been jealous, to take into consideration the fact, if proven, that he was jealous, in determining the degree and extent of the passion which existed at the time of the killing.

The 5th instruction asked for the prisoner, and refused by the court, was and is as follows : Although the prisoner may not have been so insane as to excuse him entirely, yet in determining whether at the time of the killing he acted without deliberation, and under the influence of such a sudden and

irresistible passion as would reduce the grade of the offense from murder to manslaughter, it is proper for the jury, if they believe that the same provocation would arouse such a sudden and irresistible passion in his mind, if so affected by drunkenness, when it would not have aroused it if he had not been affected with drunkenness, to take into consideration the fact, if proven, that he was affected with drunkenness, in determining the degree and extent of the passion which existed at the time of the killing.

6th instruction asked for the prisoner: If the jury believe, from all the evidence, that there is a *preponderance* of proof in support of the antecedent insanity of the prisoner, that is to say, that the *preponderance* of proof from all the evidence in the case shows that the prisoner was affected with insanity in May, A. D. 1858, then the law presumes that the prisoner so *continued* to be affected with such insanity up to and at the time of the killing; and in that case, unless the jury are satisfied, beyond a reasonable doubt, by all the proof and circumstances in evidence, that the prisoner had recovered from being so affected with insanity, if proven, and that the prisoner was sane at the time of the killing, the jury should find the prisoner not guilty.

Which instruction the court qualified as follows: In determining the question of sanity or insanity in May, 1858, the jury are not to take the testimony of the witnesses, Morrell, Berry and Stitt alone on that point, nor the testimony of all or any one of the other witnesses who have testified on the same point alone, but they are to judge from all the facts and circumstances connected with his previous and subsequent conduct, as well as from his manner, appearance, conduct, and conversation at and near the time of killing, which are in proof. And if from all the evidence before them they are satisfied, from a preponderance of testimony, that the prisoner was generally insane in that month, they must presume that such insanity continued up to and existed at the time of killing, if there is not proof to the contrary, which satisfied them that he was subsequently and before the killing restored to a sane condition of mind.

To the giving of the said 4th, 5th, 6th, 7th and 9th instructions for the People, and each of them, the prisoner, by his counsel, then and there excepted.

To the refusal of the court to give the defendant's 1st, 3rd and 6th instructions asked by him, and to the qualifications of each of them by the court, the prisoner, by his counsel, excepted.

To the refusal of the court to give the 4th and 5th instructions, and each of them, the prisoner, by his counsel, excepted.

After the evidence and arguments of counsel were closed, and the instructions had been given, the jury retired, under the charge of a sworn officer, to deliberate upon the verdict, on the afternoon of July 19th, 1859, and on the morning of July 20th, 1859, said jury were suffered to come into court, and the following queries in writing were propounded to the court by the foreman of said jury:

Does a deliberate intention to kill, as found in the 9th instruction of *The People* v. *W. B. Fisher,* mean, or intend to mean, a full consciousness on the part of the prisoner of the enormity of the crime, or merely a calculation or contrivance of means to kill, without such consciousness?

Whereupon the court, at the request of the jury, gave the following instructions:

The law of provocation, when applied to sane persons so as to reduce the killing from murder to manslaughter, is the unlawful killing of a human being without malice express or implied, and without any mixture of deliberation whatever. If from motives of hatred, revenge, jealousy, or any wrong or injury, real or imaginary, one person kill another, the killing shall be referred to malice, and must be considered murder. If, however, the killing is the result of a sudden, violent impulse of passion, caused by a serious and highly provoking injury inflicted upon the person killing, which is sufficient, in the minds of the jury, to excite an irresistible passion in a reasonable person, or there is an attempt by the person killed to commit a serious personal injury on the person killing, then it is manslaughter and not murder.

2nd. The law makes the killing of a human being murder when there is an intention deliberately formed to take the life of another, and another is killed. In determining the question of intention, it is competent for the jury to take into consideration any facts in proof, which show that the mind of the person killing was affected with insanity at the time of killing. If they believe that at such time the mind was so far and so much affected with insanity as to satisfy them that he had not, prior to the killing, deliberately formed an intention to kill, or that at the time of the killing he had so far lost the control of his reason, by reason of his insanity, as to be incapable of acting upon such intention, or had forgotten or abandoned it, though it may have been formed, then they may be satisfied that he could distinguish between the right and wrong of the act, the killing is manslaughter and not murder.

To all of which the prisoner, by his counsel, objected. The court overruled the objection, and the prisoner excepted.

And on the evening of said day the jury came into court, and by their foreman submitted the following paper to the court:

1st. The juror maintains that whatever evidence was produced on the trial in regard to any supposed provocation or provocations, or in regard to any state of mind indicating insanity, may have any weight, or such weight, in the mind of the juror, as in his judgment it may demand, either in excusing or mitigating the crime of murder.

2nd. The juror maintains that he is competent to judge of the correctness of any or all of the instructions of the judge, as his, the juror's, own opinion of the law may dictate.

Whereupon the court instructed the jury as follows:

1st. The deliberate intention to kill, within the meaning of the instructions given on that point, is a deliberately formed purpose to take the life of a human being. It is not necessary that the prisoner should have maturely considered all the consequences of the act. If the evidence satisfies the jury beyond a reasonable doubt that there was this deliberately formed purpose to take the life of the deceased, then they must find that the killing, if there was a killing, was of malice aforethought. It does not change the character of the killing if the consequences of the act have or have not been maturely considered or foreseen by the prisoner. It is enough in the eye of the law if the purpose to kill was deliberately formed, and the killing was deliberately done in pursuance of that purpose; such killing is murder.

2nd. Before an unlawful killing can be made manslaughter on the ground that the prisoner's mind was affected with insanity, it must be made to appear, by clear and satisfactory proof, that it was affected to such a degree that it was incapable of deliberating upon the time and mode of killing, or of acting upon any rational ground of provocation. The mind must be so far emancipated from the dominion of reason as to be incapable of carrying into execution any deliberately formed purpose to kill, and this by reason of insanity, and not of ungovernable and ill regulated passions, aroused by provocations insufficient to excite them in reasonable persons.

3rd. Before the jury can acquit entirely on the ground of insanity, they must be satisfied, from the proof in the case, that at the time of the killing the prisoner was so insane that he did not understand that the killing was contrary to the laws of God and the State, and on this point no testimony on the ground of provocation is to be considered.

4th. The jury must take the law as given to them by the court as the law which is to govern them in this case. It is for the jury to determine whether the law, thus laid down by the

court, is applicable to the proofs in the case. If the jury find the facts to be such as to make the law applicable, either to a case of murder, manslaughter, or to a case of insanity, or to a state of innocence, the law as laid down to them must be made to apply. It is not for the jury to say that the instructions given are not the law by which they are to determine the guilt or innocence of the prisoner.

Objection by prisoner; overruled, and exception taken.

On the 21st day of July the court permitted Abner A. Fisher, one of the jurors, to retire from the jury then deliberating in the jury room, and come into court, under the charge of an officer, and converse with the court; and the court received at the hands of the officer in charge of said jury, a writing signed by said Fisher, as foreman of said jury, and the court informed the said juror that he would instruct the jury further in the evening of said day, according to the request of said jury in said writing expressed, which writing was and is as follows:

*To the Hon. M. E. Hollister:*

As we are not permitted to explain to the honorable court our strange and peculiar situation, we ask the instruction of the honorable court upon the following points:

1st. Is it lawful for a juryman to go behind our statute law and search the Bible to see whether our statute laws are not void in consequence of their disagreement with the higher law.

2nd. Is it lawful for a juror to go behind the testimony and read medical books to see whether the doctors and others examined on the trial testified correctly or not.

3rd. Is it lawful for a juryman to go behind the trial and search law books to see whether the judge did not exclude some testimony that ought to have been admitted.

4th. Is it lawful for a juror to go behind the instructions of the court and search law books for the purpose of finding some error in said instructions.

5th. Is it lawful for a juror, after admitting the proof of every essential fact which constitutes a certain crime, to bring in a different verdict, because he, the said juror, does not approve of the penalty attached to the first.

If so, how long must we remain in this worse than purgatory, and be abused and villified by a fanatical *madman*.

In behalf of the jury,

A. A. FISHER, *Foreman.*

At 8 o'clock, P. M., of said last mentioned day, the court directed the jury and the prisoner to be brought in court, which was accordingly done, whereupon the court gave to the jury the following instructions:

1st. The jury cannot lawfully disregard the statute of the

State which defines what crime is, and take the Bible for the law. They have no right to determine for themselves the question, whether the Bible and the law, as given to them by the court, agree or not. There is but one law by which they are to decide the question before them, and that is the law laid down to them by the court.

2nd. The jury must be governed by the sworn testimony in the case. They have no right to consult medical works to determine the truth or falsity, or the weight of sworn testimony.

3rd. It is not the law that the jury can go outside of the case, as given to them by the testimony and the instructions of the court, and determine for themselves whether the law, as given to them, is or is not the law; nor have they any right to determine for themselves whether the court did or did not err in excluding or receiving testimony. They cannot presume that there is any fact or circumstance which may have had a bearing in the case, except such as is given to them in the testimony. The law is, that no fact exists, except it is shown to exist by the testimony.

4th. It is not lawful for the jury to go behind the instructions given to them by the court, and take it upon themselves to determine by law books, or in any other manner, whether the ruling of the court is or is not correct. They must take the instructions, as they receive them from the court, to be the law by which they are to be governed in the case.

5th. The jury have no right to call murder manslaughter, nor manslaughter murder, any more than they have a right to call either the one or the other robbery. The law defines what crime is, and the jury must take that definition as it stands in the instructions given to them. The law is further, that the jury have no right to determine for themselves the character of the crime, because they may be opposed to the kind of punishment which the law prescribes. They have no business with the punishment. It is for them to find the facts and the law as it is laid down to them by the court; they are to say, guilty or not guilty, on their oaths. When the verdict is rendered, it is for the court to pronounce the punishment which the law prescribes.

6th. The jury must be satisfied, from the proof in the case, that the mind of the prisoner was affected with insanity, as laid down in the second instruction of the court, given on the 20th instant, before they can find him guilty of manslaughter for that reason. The fact of insanity to that extent must not be left in doubt. The mind or judgment of the jury must be convinced from the testimony, that his mind was affected with insanity to that extent, before they can pronounce the killing, if proved, for that reason, manslaughter.

To the giving of said instructions by the court, the prisoner's counsel objected. The court overruled the objection, and the prisoner's counsel excepted.

On the 22nd day of July, the jury came into court for the purpose of asking further instruction, and presented the following query, written in pencil :

" *To his Honor M. E. Hollister :* Is the jury to give equal evidence and weight to the testimony of each and every witness stating facts (and not their opinion upon subjects) that are not impeached or in any way contradicted by other witnesses or circumstances, and to receive the same as truth ? "

Whereupon the court gave to the jury the following instruction :

The law does not require that the jury should give equal credence and weight to the testimony of each and every witness who testifies to facts (independently of opinion) that is not impeached or in any way contradicted by other witnesses or circumstances. They are to receive such testimony, and determine for themselves whether it is true or false. If they believe, from his appearance on the stand, from the manner in which he testified, from his candor and intelligence, from his manner of information upon the point to which he testifies, and from his impartiality, that he testifies truly, they must receive it as truth, though not corroborated by other proof. But if, on the contrary, the witness appears to testify under a strong bias, or from feelings of interest or revenge, or from want of correct information, or in any manner that, in the eye of reason, appears to be suspicious or incredible, they may reject his testimony, though not contradicted by other witnesses or circumstances. This rejection or admission of testimony must be reasonable and not captious, and must be justified on the ground that it either convinces or fails to convince the judgment of a candid and impartial man.

To the giving of the above instruction, the prisoner, by his counsel, objected. The court overruled the objection, and the prisoner, by his counsel, excepted.

Abner A. Fisher, one of the jurors, stated to the court, verbally, that there was no probability of the jury ever agreeing, and wished the court to discharge the jury, which the court refused to do, saying at the same time to the jury in reply, that he considered it his duty to keep the jury longer, in view of the fact that the prisoner was charged with the commission of the highest crime known to the law, and that the security of the life of the people, required, as well as interests of the prisoner, that the jury should not be discharged until every effort had failed, and there was no probability whatever that the jury could

agree.   In this connection the court remarked to the jury, that before the next term of this court, the witnesses may be in their graves, and justice may be cheated of its victim.   To the making of this latter remark to the jury, the prisoner, by his counsel, then and there excepted.

The counsel for the prisoner then asked the court to have some instructions given to the jury, for the prisoner.   The court decided that no instructions of the prisoner could be given, and refused to suffer the prisoner's counsel to offer any instructions on his behalf, remarking that no further instructions would be given, either for the People or the prisoner, except requested to do so by the jury.   And to this decision of the court, in that behalf, the prisoner's counsel then and there excepted.

The court remarked to the jury, orally, that in the opinion of the court, it was proper for any juror to communicate to the court, in writing, in reference to their differences, and that the court would, if they were so communicated in writing to the court, determine whether it was expedient to keep them together any longer.   To which oral remarks of the court the prisoner's counsel excepted.

O. C. GRAY, and GLOVER, COOK and CAMPBELL, for the Prisoner.

N. BUSHNELL, District Attorney, for The People.

BREESE, J.   The loose and disconnected manner in which this record is made up and presented to the court, would fully justify, in an ordinary case, its rejection altogether, but as it is in a case in which the life of an individual is involved, we have studiously endeavored to extract from it all such portions as we have deemed the most important.   We will state very briefly the results at which we have arrived, no time being allowed for elaborate argument or illustration.

Very many exceptions have been taken to the rulings of the court on the various questions raised, all of which we do not consider it necessary to notice.

The first twelve exceptions which were taken on the trial, we do not consider to have been well taken, as the evidence offered had no direct bearing upon the issue to be tried.   The testimony of David Strawn, given on behalf of the People, might not, at first view, be considered pertinent, but as rebutting testimony, it may have been, and in the absence of all proof in the record, the testimony not being certified to us, we are inclined so to consider it.

We have no fault to find with most of the instructions given

to the jury before they retired, on behalf of the People, nor with the refusal of the court to give the instructions as asked by the prisoner.

Those on the part of the People, going to the question of insanity, state the law correctly, for the most part. The jury, in all cases where such a defense is interposed, should be distinctly told that every man is presumed to be sane, until the contrary is shown—that is his normal condition. Before such a plea can be allowed to prevail, satisfactory evidence should be offered that the accused, in the language of the criminal code, was "affected with insanity," and at the time he committed the act, was incapable of appreciating its enormity. This rule is founded in long experience, and is essential to the safety of the citizen. Sanity being the normal condition, it must be shown, by sufficient proof, that from some cause, it has ceased to be the condition of the accused.

On the evening of the 20th of July, the jury having been out more than twenty-four hours, and unable to agree, came into court, and through their foreman, submitted to the court a paper written upon in pencil, among other matters the following: "The juror maintains that he is competent to judge of the correctness of any or all of the instructions of the judge, as his, the juror's, own opinion of the law may dictate." To this the court responded as follows: "The jury must take the law as given to them by the court, as the law which is to govern them in this case. It is for the jury to determine whether the law thus laid down by the court, is applicable to the proofs in the case. If the jury find the facts to be such as to make the law applicable either to a case of murder or manslaughter, or to a case of insanity, or to a state of innocence, the law as laid down to them must be made to apply. It is not for the jury to say that the instructions given are not the law by which they are to determine the guilt or innocence of the prisoner."

On the following day, the 21st of July, the jury again came into court, and among other matters, the court told them, in answer to a question propounded by them: "There is but one law by which they are to decide the question before them, and that is the law laid down to them by the court," and further, that "It is not the law that the jury can go outside of the case as given to them by the testimony and the instructions of the court, and determine for themselves whether the law, as given to them, is or is not the law," and further, that "It is not lawful for the jury to go behind the instructions given to them by the the court, and take it upon themselves to determine by law books, or in any other manner, whether the ruling of the court is or is not correct. They must take the instructions as they

receive them from the court to be the law by which they are to be governed in the case," and further, that " the law defines what crime is, and the jury must take that definition as it stands in the instructions given to them."

On the day following, July 22nd, the jury came again into court for further instructions, and, through their foreman, propounded, in writing, another question to the court, as to the credit to be given to witnesses, on which the court properly instructed the jury, and on concluding, the foreman of the jury informed the court that there was no probability of the jury ever agreeing, and wished the court to discharge them, which the court refused to do, and remarked to the jury that he " considered it his duty to keep the jury longer, in view of the fact that the prisoner was charged with the commission of the highest crime known to the law, and that the security of the life of the people required, as well as the interests of the prisoner, that the jury should not be discharged until every effort had failed, and there was no probability whatever that the jury could agree;" remarking to the jury, in this connection, " that before the next term of the court, the witnesses may be in their graves, and justice may be cheated of its victim." At the same time, the prisoner's counsel asked the court to have some instructions given to the jury for the prisoner, which the court refused to allow, or suffer them to offer any instructions on his behalf, declaring that no further instructions would be given either for the People or the prisoner, except requested to do so by the jury.

Section 188 of the criminal code, (Scates' Comp. 408,) declares in the most pointed and emphatic language, that " Juries, in all cases, shall be judges of the law and the fact." This power is conferred in the most unqualified terms, and has no limits which we can assign to it. We have said, in the case of *Schneir* v. *The People, ante,* p. 17, that, being judges of the law and the fact, they are not bound by the law, as given to them by the court, but can assume the responsibility of deciding, each juror for himself, what the law is. If they can say, upon their oaths, that they know the law better than the court, they have the power so to do. If they are prepared to say the law is different from what it is declared to be by the court, they have a perfect legal right to say so, and find the verdict according to their own notions of the law. It is a matter between their consciences and their God, with which no power can interfere. There can be no apprehension of oppression to the citizen in so looping this power, for an erroneous decision of the jury against a prisoner can be corrected by the power remaining in the court to award a new trial. The jury were not bound to take the law as " laid

down" to them by the court, but had the undoubted right to decide it for themselves, and in refusing so to declare, the court erred.

The remark made by the court, on the 22nd of July, when the jury desired to be discharged, should not have been made. It had a powerful tendency to prejudice the prisoner, as indicating the opinion of the court that he was a guilty person, and a proper victim. It is to be regretted such a remark was made in such a case—one of life or death, in which the supposed leaning of the court, no matter how unfounded, is calculated to influence a jury. This, of itself, would be sufficient to reverse the judgment.

The court also erred in refusing, after making these remarks to the jury, to permit the prisoner's counsel to offer any instructions which the remark of the court was well calculated to suggest, and which, if permitted to be given, might have blunted the force of the remark. We hold, when a jury comes into court asking instructions, and are placed in a situation to be influenced by the court, the prisoner had an unquestionable right to present such views, in the shape of instructions to the jury, as the circumstances might require in his own behalf, and the court should have allowed it.

As a question of practice, we do not think it is proper for any juror to communicate to the court in writing or verbally, in reference to any matter belonging to the case. If they desire to communicate with the court, they should send a request to the court through the officer in attendance, that they may, in a body, be brought into court. Nor do we think it good practice for the court to permit any one of the jurors, whilst they are deliberating, to leave the jury room and come into court, and hold a conversation with the court, or that the court should make such a request of the foreman or of any other member of the jury. It is liable to great abuse.

We have said we were satisfied with most of the instructions given for the People before the jury retired. Such is the confused state of the record, and the want of time at our disposal, that we have not been able to examine them all so critically as we could wish, but are satisfied some of them, as the eighth and ninth on behalf of the People, require some modification, so as to conform to the principles we have here endeavored to lay down.

We also think the prisoner's fourth instruction should have been given. Though such a state of mind would not excuse the homicide, it should reduce it to manslaughter, for deliberation would be absent, and that is essential to constitute murder.

For the reasons we have so hurriedly given, the judgment must be reversed, and the cause remanded for a new trial.

*Judgment reversed.*

Separate and dissenting opinion of WALKER, J.

In this case the court below instructed the jury that it was the province of the court to expound the law, and it was for the jury to receive the law thus given them, and apply it to the facts of the case. And that the jury have no right to say that the rules announced as law by the court are not such, and that in forming their verdict they must be governed by it as given in the instructions. And that the court gave the proper construction to the latter clause of the 188th section of the chapter entitled " Criminal Jurisprudence," R. S., which is this : " Juries in all cases shall be judges of the law and the fact;" I am fully satisfied. In the case of *Schnier* v. *The People*, (*ante*, p. 17,) the majority of the court held that the jury were the uncontrolled judges of both the law and the facts, under this provision. And that they were not bound to receive the law as announced by the judge ; and the majority of the court in this case adopt and apply the same construction. Having then dissented to that construction, and still entertaining the same views, I shall proceed, as far as my limited time and opportunity will permit, to give my reasons for dissenting from the opinion of the court.

In determining what was the intention of the legislature in adopting this provision, it may be proper to refer to the history of criminal jurisprudence, in the country from which we have adopted, with modifications, our criminal code. And when it is remembered that in former times juries were required to find special verdicts, leaving the courts to determine whether under the facts found by the jury, the law when applied to the facts, would hold the defendant guilty of the crime charged, we can see a controlling reason for the enactment of some provision by which courts should be effectually precluded from the exercise of a power so liable to abuse, and dangerous to the liberty of the citizen. It was, in its day, justly claimed that the exercise of such a power virtually deprived the accused of the benefit of trial by jury, which right, by the English subject and the American citizen, has at all times been guarded with jealous care.

Under the construction given this provision by the court, it can hardly be that it is intended to adhere to the literal meaning of the language of the law. If so, then it must inevitably follow, that on every question of the admissibility of evidence, the qualification of a juror, the constitutionality of the law creating the crime, as well as the true construction of the act creating the offense, may be considered and passed upon by the jury, in making their verdict. After they have retired to their room, they would, under such a construction, have the right to review the decisions of the court in admitting evidence, and

exclude from their consideration such portions as they supposed were illegally before them. They would also have the right to determine whether the law creating the offense was warranted by the constitution. They could place upon the act creating the offense, any construction they might choose, and all this in direct opposition to the instructions of the court, based upon well-settled principles of criminal jurisprudence, received, acted upon and approved, by the wisest and best judges of all ages. Can it be possible that the legislature ever intended to confide to twelve men, who have never perhaps even read the criminal code of our State, unacquainted with the law of evidence and the rules of construction, and uninformed as to the whole theory of criminal jurisprudence, such absolute power over the life and liberty of the citizen ? I am constrained, from the great care manifested by the legislature for security to the life and liberty of the citizen, to believe that such was not its intention. Such a doctrine, it strikes my mind, would inevitably lead to the unsettling of all criminal law. If the jurors are the uncontrolled judges of what it is, and their finding in a particular case settles the law of that crime, is a jury in a subsequent case to be governed by it, or may they disregard it, or, if bound by it, who can know and conform his actions to it ? Or if, on the contrary, every jury may settle the law for themselves, give a construction to the statute, and either acquit or convict upon the construction thus given, in defiance of the decision of the highest judicial tribunal known to the law and the instructions of the circuit judge, or even in the teeth of the statute itself, no one can, by any possibility, know what the law is until the jury have announced it by the decision of the case. And while I may concede all that is claimed for the trial by jury, I am irresistibly impelled to conclude that such an uncontrolled power, placed in the hands of twelve men, uninformed even in the elementary principles of the law, is fraught with dangers, and is liable to abuse, however honest their purpose, to an extent equal to all its benefits.

The statute has not given any review by this court (until very recently), of the finding of the jury upon the facts in a criminal prosecution. Until then, even as against the accused, appellate courts have not looked into the evidence, but have confined their inquiries to the law as expounded by the court. Nor is there any provision which authorizes this court to review the decision of the law made by the jury. And if the jury may disregard the instructions of the court, how can we say that a wrong instruction contributed in the slightest degree to the result at which they arrived ? They may, for anything we can presume, have disregarded it, and determined the law correctly.

And if they are the uncontrolled judges of the law, and the legislature has made them such, we should presume that they knew the law and acted upon it. If the legislature intended that they should be such judges, they must have supposed that they were competent and qualified to decide all legal questions arising in the progress of the trial. But if it were admitted that the jury are the judges of the law, and may disregard the instructions of the court, in its practical application, what is to be its effect? Is the majority of the jury, like the majority of the members of a court, to determine the law, or must they, as in the finding of facts, unanimously agree? May one of the jurors, who differs with the others, refuse to concur in the construction of the law, given by the eleven other jurors and the judge, defeat justice, from his mere whim or caprice, and prevent an acquittal or a conviction? Such, I conceive, never could have been the design of the legislature, by this enactment. So far as my observation and experience has extended, such has not been the practice of courts, or the understanding of the profession. In this case the court had fully, clearly and unmistakably instructed the jury, that they were the judges of the law and fact, and that if he instructed contrary to the law it would be error, and the instruction complained of was given in answer to specific questions, propounded by the jury, as to whether they had the right to go behind the instructions and see if they were in conflict with the Bible, and whether they had the right to read medical books to see whether the physicians testified correctly, and to examine law books to ascertain whether evidence was properly admitted. To these inquiries this instruction was designed as an answer. And the jury must have so regarded it, when it was given. They had asked no question that related to the commission of the act itself, or what it required under the statute to constitute the crime. We may safely infer that on that question they had no difficulty, and unless they are to be the judges of all questions of law arising on the trial, I think they could not have been misled by this instruction.

I am constrained to come to the conclusion, (and I do it with hesitation, when my learned brethren, for whose more extensive and enlarged experience than my own, I have the highest respect,) that the true construction of this provision requires the jury to receive and act upon the law as announced to them by the court. When it is thus given, the duty is theirs to judge of that law, and determine whether, when applied to the facts proven and found by them in the case, the accused is guilty or innocent. This removes, as it should, from the judge all right to find the facts, but leaves him responsible for the determina-

tion of the law creating the crime charged, the application of the law of evidence offered to establish the crime charged, and the jury responsible for the proper application of the evidence thus admitted, and the law thus announced to them. They are thus made the judges of the law and facts of the case. If they misapply it to the facts, and a conviction follows, the Circuit Court may grant a new trial, or, if refused, it may be corrected in this court, and if the judge errs in giving instructions, either as to the law, or so as the jury may have been misled, the correction may be had, as we would then presume the jury had acted upon and been governed by the law as announced by the court. This construction frees the administration of criminal justice from all difficulty. It leaves the judge and jury severally responsible for their acts in the trial of the cause, and enables us to see where the error was committed, and to apply the correction.

The statute, in defining voluntary manslaughter, has required that the provocation, to be produced by the infliction of, or an attempt to commit, a serious bodily injury, must exist, in order to reduce the offense from murder to manslaughter, and I think that the defendant's fourth instruction was, therefore, properly refused, as there is no evidence of such an injury inflicted or attempted upon the accused. I am not prepared to hold that the judgment of conviction should not be reversed for the remarks of the judge on the trial, but can perceive no other reason for reversing a conviction which I, in other respects, regard as fair.