### Bovard *v*. The State, 30 Miss. Rep., 600.

#### Homicide—Insanity.

Instructions given to the jury as follows:

1. The law presumes every man to be sane, until the contrary is proven.

2. That if the jury believe, from the evidence, that the accused killed the deceased with malice, and not in necessary self-defense, he is guilty of murder, notwithstanding they may believe he was, at the time of committing the deed, laboring under partial insanity, unless he was, from such insanity, incapable of understanding the nature and consequence of his act, and of knowing that it was wrong, and that he would be punished for it.

3. That insanity, however produced, constitutes no excuse for crime, unless it be so great as to deprive the party of his power to understand the nature of his act, or of his ability to distinguish between right and wrong, and of his ability to understand that he will be liable to punishment if he commits it.

4. That though a party be partially insane, yet he is responsible for his criminal acts, unless it appear that he was prompted or instigated by his madness to perpetrate such act.

5. That if the homicide charged is proven, in the opinion of the jury, the barbarity of the act affords no legal presumption of insanity in the accused.

*Held*, that these instructions correctly expounded the law in regard to insanity, as a defense for crime.

Error to Yazoo circuit court. Henry, J.

Young C. Bovard, the plaintiff in error, was indicted in the circuit court of Yazoo county, for the murder of his wife, on the 20th day of November, 1855, and was convicted. The defense relied on was, that the act of homicide was committed whilst the prisoner was insane.

The opinion of the court contains the facts of the case.

*John M. Moore*, for plaintiff in error, cited and commented on Commonwealth v. Rogers, 7 Metc., 500; The State v. Gardner, Wright, Ohio R., 392; State v. Spencer, 1 Zab. R., 196; 1 Greenl. Ev., §42; Ray, Med. Juris., 413; 1 Copeland, Dictionary of Medicine, 572; 1 Cyclopædia of Practical Medicine, 587.

*D. C. Glenn*, attorney-general, argued the cause orally.

Smith, C. J.:

The plaintiff in error was indicted and tried in the circuit court of Yazoo, for the murder of his wife. No question whatever was raised as to the fact of homicide, or the agency of the accused in the commission of the deed. The defense was placed solely on the ground of insanity; and the jury having found the prisoner guilty of the charge, a motion was made to set aside

the verdict, and for a new trial. The grounds upon which the motion was based were, first, misdirection in the charges to the jury; and, second, that the verdict was contrary to law and evidence. The same reasons are now urged as a ground for reversing the judgment.

In support of the first ground, it is insisted, that the third, fourth and fifth instructions for the state are erroneous, inasmuch as they " do not properly and fully explain the legal consequences of insanity, and lay down rules for the guidance of the jury, under which the accused might be convicted, although proved by the evidence to have been insane at the time the alleged offense was committed."

The only questions which could properly arise upon the evidence before the jury, were, first, whether the accused labored under a general derangement of his moral and intellectual faculties; second, whether he was affected with partial mania, accompanied with a delusion which was connected with, or embraced in the circle of its operation, the act with which he was charged; and third, if by the proof he was shown to have been either generally or partially insane, whether the insanity was of such a character as to absolve him from responsibility as a moral agent."

A person, in the estimation of the law, to be capable of the commission of a crime, must have intelligence enough to have a criminal intent and purpose; and if his mental capacity is either so deficient that he has no conscience, nor will, nor controlling mental power over his actions; or if through the access of mental disease his intellectual power is for the time completely suspended, he is not to be regarded either as a moral agent or punishable by the law for his acts.

Cases of insanity of such extreme character as these are not easily mistaken. And it is not to be controverted that the prisoner, as shown by the evidence, was not so totally deprived of conscience, will, or mental control over his actions, or that his intellect and capacity were not so utterly deficient, as to be incapable of entertaining a criminal purpose.

But in cases of partial insanity, where the mind, though capable of memory, of reasoning, and of judgment, is clouded and

weakened, or so perverted and influenced by insane delusions, as to be compelled, as it were, to act under false impressions and influences, the rule of law, as it is now generally understood, is laid down by Chief Justice Shaw as follows : "A man is not to be excused from responsibility if he has reason and capacity sufficient to enable him to distinguish between right and wrong as to the particular act he is then doing, a knowledge and consciousness that the act he is doing is wrong and criminal, and will subject him to punishment. In order to be responsible, he must have sufficient power of memory to recollect the relation in which he stands to others, and in which others stand to him ; that the act he is doing is contrary to the plain dictates of justice and right, and injurious to others, and a violation of the dictates of duty. On the contrary, although he may be laboring under partial insanity, if he still understands the nature and character of his act and its consequences ; if he has a knowledge that it is wrong and criminal, and a mental power sufficient to apply that knowledge to his own case and to know that, if he does the act he will do wrong and receive punishment ; such partial insanity is not sufficient to exempt him from responsibility for criminal acts." Com. v. Rogers, 7 Met. R., 500.

Without quoting the instructions to which exception is taken, or noticing them in a more special manner, it is sufficient to state that they contain, in very distinct and intelligible terms, the rules laid down by the learned judge in the charge from which we have quoted above. In our opinion, therefore, there was no error committed in giving the instructions which were requested in behalf of the prosecution. Nor do we think there was error in withholding either of the instructions which were requested by the prisoner and refused by the court.

The remaining ground upon which reversal of the judgment is claimed is, that a motion for a new trial was improperly overruled. The question thus presented must, of course, be determined by the evidence submitted to the jury, and we will proceed to notice such of the facts established by the testimony which tend to prove or disprove the insanity of the accused.

The homicide was committed on the night of the 20th of November, 1855. The prisoner was for several years previous

to that date a man of intemperate habits; some eight or ten days before the deed was committed he was very much intoxicated, but it was supposed that he had abstained entirely from drink for the five or six days immediately preceding the 20th of November.   On the 19th he had been at Benton, which was four miles distant from his place of residence; and on his return he was met by Dr. Woods, who had previously been his physician; he complained of being unwell; he said his right arm was dead and he could not use it; he complained of soreness about the shoulders and neck.   Dr. Woods, from a slight examination, thought it might be paralysis arising from intemperance.   He was rational, and the doctor observed no symptoms of delirium tremens or any indication of mental derangement of any description about him. On the same day he was at Mr. Quini's, dined there and ate more heartily than usual; Mrs. Quini observed no wildness in his appearance at dinner; he frequently changed the subject of conversation, acted strangely, and walked more rapidly than usual.   He went away and returned some time after dark; he then appeared to be under some delusion connected with the subject of religion; he said he had got religion, that his wife had got religion, and was the happiest woman in the world; he had come back to tell Quini and wife of it; he wished them to get religion, also; and insisted upon their getting " down and going through the religious performance ;" he prayed, preached, and said he had turned preacher.   He frequently ran out into the piazza and seemed to be watching for something; said that they would get religion in a few minutes; that he saw it coming down from heaven.

These acts and declarations, and many others of a similar character, and quite as frantic and absurd, if they were not simulated, undoubtedly show that he was afflicted with partial insanity, attended with delusion, on the subject of religion.

He left Quini's and returned again the same night; the weather was cold, and he went back in his shirt and drawers, without hat or shoes; and behaved in the same way.   He was persuaded to go to bed, and was supposed to sleep; he remained quiet for two hours; he then got up and went away.   On the

following day, the 20th of November, at eight o'clock, he returned to Quini's, and deported himself much in the same manner that he had on the previous night. He asked for breakfast; said that he had eaten nothing that morning; that breakfast was ready when he left home, but that he could not wait. He sat down to the table and ate as usual. On the 19th or 20th, he spoke of his "lame arm," and said that it had got well. From Quini's, after having remained an hour, he went to the graveyard and assisted in putting down a post; a person being then engaged in paling it in. He was rational; and, while there, evinced no indications of mental alienation. At home, in the evening of the 20th, his conversation and conduct indicated that he was under the same delusion under which he appeared to labor in the morning and on the preceding night. He was kind and affectionate to his wife, and manifested great solicitude on her account. He showed no dislike or hostility to any one; did not appear to be suspicious of any one; and although he said they would all be dead in a short time, he did not appear to be alarmed on that account.

On the 21st, the day following the commission of the deed, he appeared to be in full possession of his intellectual faculties; he confessed his crime, described its atrocity in the strongest terms, expressed great remorse at having committed the deed, but declined to state his motive for its commission.

Late in the evening of that day he was visited by Dr. Holmes. The doctor was under the impression that he was asleep when he first went in; his pulse was natural, and he thought that the accused was not laboring under any disease whatever. He had known the accused for many years, and had never seen him with the symptoms of *mania-a-potu* upon him. On the occasion of this visit, he saw nothing about the accused which indicated insanity.

In reviewing the evidence in the case before us, it is impossible to come to the conclusion that the plaintiff in error, at the time he perpetrated the crime, was affected with a mental malady which involved his entire intellectual faculties; and there are very cogent reasons for rejecting the hypothesis, that his affection was that of delirium tremens.

According to an approved writer on the medical jurispru-

dence of insanity, this disease—delirium tremens—at its approach is generally attended, amongst other symptoms, with disturbed sleep and impaired appetite; after the symptoms have continued for two or three days, they increase in severity, the patient ceases to sleep altogether, and soon becomes delirious. At first the delirium is not constant—the mind wandering during the night—but during the day, when its attention is fixed, capable of rational discourse. It is not long, however, before it becomes constant, and constitutes the most prominent feature of the disease. This state of watchfulness and delirium continues three or four days, when, if the patient recover, it is succeeded by sleep, which at first appears in uneasy and irregular naps, and lastly, in long, sound and refreshing slumbers. Ray, Med. Juris., 417.

"Almost invariably," says the same author, "the patient manifests more or less feelings of suspicion and fear, laboring under continual apprehension of being made the victim of sinister designs and practices." "One of the most common hallucinations is to be constantly seeing devils, snakes, vermin and all manner of unclean things about him, and peopling every nook and corner of his apartment with these loathsome objects. The extreme terror which these delusions often inspire, produce in the countenance an unutterable expression of anguish, and frequently impels the patient to the commission of suicide."

Assuming this to be a correct description of the course, and constantly attendant symptoms of *mania-a-potu*, it is difficult, if not impossible, to believe that the accused labored under that disease.

The disease, if it ever existed at all, did not manifest itself until the afternoon of the 19th of November; for on that day, at dinner, none of its peculiar and marked symptoms were observable; on the contrary, he was neither irrational nor delirious, and ate more heartily than usual. On the following morning, although, if we judge from the evidence in relation to his conduct during the night, his malady had made most rapid progress, he ate his breakfast with unimpaired appetite, and went, in compliance with his promise, to assist in putting an inclosure around the grave-yard; and whilst there disclosed no indication of irrationality or symptoms of delirium tremens. These facts

are irreconcilable with the idea that, if he labored under any mental affection, it was that of delirium tremens.

The total absence of almost every marked peculiarity usually attendant upon this disease, and particularly the short continuance of the attack, and the complete restoration of the accused to his natural, sound and healthy state, within less than thirty hours after its commencement, render this conclusion unavoidable.

There are several facts and circumstances connected with this transaction, as they appear from the evidence, which might well have authorized the jury to doubt whether the accused was at all affected with any form of mental malady. But conceding that there was no attempt at simulated mania on the part of the accused, and that he in fact did labor under some disease of the mind, which amounted to partial, but very temporary insanity, according to the rule of law which must govern in the case, he is clearly to be held responsible for his act.

There was no proof that the accused had not capacity and reason sufficient to distinguish between right and wrong, in relation to the act which he committed; or that he had not a knowledge and consciousness that it was wrong and criminal, and that punishment would be inflicted upon him in consequence of its commission; on the contrary, he was perfectly rational, except in reference to a single class of subjects, about which he seemed to entertain very wild, ridiculous and absurd notions. But there was no proof before the jury which, either directly or by inference, showed that the fancy or delusion under which he labored had any connection as the antecedent or cause with the commission of the offense. It is not sufficient to absolve from the penalties of the law, that the party charged was partially insane, and that such insanity was attended with delusion. In all such cases it is essential that it be clearly shown, in order to excuse, that the act was committed under the direct or necessary influence of such delusion.

Judgment affirmed.

Note.—The early English authorities on the subject of insanity may be found in 3 Coke Inst., 6; 1 Hale P. C., 30; 8 Hargrave's State Tr., 322; 16 Howell's St. Tr. 695–794.

In Lord Ferrer's case, in 1760, tried by the House of Lords, for murder, we find the first intimation of views that afterwards grew into a decided test, and which might be expressed thus:

"If the accused, at the time the act charged was committed, knew right from wrong, he was accountable."

It being held, that if the accused had such possession of reason as enabled him to comprehend the nature of his actions, and "could discriminate between moral good and evil," it was sufficient. The defendant was convicted and executed. 19 Howell's St. Tr., 947. See Bellingham's case, 5 C. &. P., 169, and note; Collinson on Lunacy, 630; 54 Ann. Reg., 304, (1812.) Also Tonsley's case, 3 Foster & Fin., 847; also Oxford's case, 9 C. & P., 532; Bowler's case, tried at the Old Bailey, for murder, in 1812; Offerd's case, 5 C. & P., 168. See also 1 C. & K., 129; Stokes' case, 3 ib., 185. See also the opinions of Lord Brougham and the judges, in reference to McNaughten's case, 10 Clark & Fin., 200, quoted in 1 Beck Med. Juris., 793, Ed. 1863; Regina v. Layton, 4 Cox C. C., 149.

In the cases of Regina v. Allnut, before the same judge, in 1848; Regina v. Burton, 3 Cox C. C., 275; and Regina v. Pate, before Baron Alderson, (see Black. Mag., Nov., 1850, p. 559,) the defense that the act was done under an irresistible impulse, which amounted to insanity, was not allowed to vary the rule. The court said, in the last case cited, "that the law does not acknowledge the doctrine of an uncontrollable impulse, if the person was aware it was a wrong act he was about to commit." And that if the jury "were not satisfied that at the time the party was suffering from a disease of the mind which rendered him incapable of judging whether the act was right or wrong," they must convict. This is still the rule in England; Reg. v. Davis, 1 Foster & Fin., 69; Reg. v. Burton, 3 ib., 780; Reg. v. Leigh, 4 ib., 915. The same rule was applied in the case of the State v. Spencer, 1 Zab., 196.

In Regina v. Vaughn, 1 Cox C. C., 80, the test was modified by extending the general knowledge of the accused as to right and wrong, to the particular act charged. As to this modification, see the cases of Pate and McNaughten, *supra*; also, Carter v. State, 12 Texas, 500; State v. Huting, 21 Mo., 476;

Com. v. Farkin, 2 Parsons, 459; Willis v. People, 32 N. Y., 717. CURTIS, J., in United States v. McGlue, 1 Curtis C. C., 8, says: "The test is the capacity to distinguish between right and and wrong, as to the particular act with which the accused is charged," etc.  See also U. S. v. Shultz, 6 McLean, 121.

In the case of Freeman v. People, 4 Denio, 49, a further modification was recognized, in this: "That the knowledge of the party as to right and wrong, meant, not such knowledge in a moral sense purely, but in a legal one.  And it may be assumed, from the debates, and from the opinions of the judges in McNaughten's case, (*supra,*) that this is the rule of the modern English authorities; and also in the United States.  See also U. S. v. Clark, 2 Cranch C. C., 158; U. S. v. Shultz, 6 McLean, 121; People v. Sprague, 2 Parker C. C., 43; Vance v. Com., 2 Va. Cases, 132; Willis v. People, 32 N. Y., 714; McAllister v. State, 17 Ala., 434; People v. Hobson, 17 Cal., 424; Loeffner v. State, 10 Ohio St. R., 598; Fisher v. People, 23 Ill., 283.

The test, so modified, might be expressed thus:

That the accused must have the capacity to distinguish between right and wrong, in a legal sense, as to the act charged.

From all which this general conclusion might be drawn:

That the incapacity to distinguish between right and wrong, in a legal sense, (as to the law of the land, for example,) and as to the act charged, would certainly excuse.

### DELUSION.

There are many cases which show that the above test has not guided or governed the administration of the law, where the " knowledge " of the party has been obliterated, or subordinated to some delusion, or mistake, or prepossession, or morbid propensity, the effect of disease of the mind; or where the party has been impelled to forget the ties of nature, or humanity, to lose all sense of right and wrong, by mental disease, caused, perhaps, by bodily ailment, but not the legitimate consequence of the long continued indulgence of bad passions.

The case of Hadfield, 27 Howell's St. Tr., 1281, is a notable one.  He discharged a pistol, loaded with slugs, at the king in the theatre.  When arrested he said he knew very well that his

life was forfeited—but that he was tired of life—that he did not intend to kill the king, but knew that the attempt would answer his purpose. The evidence tended to show that he labored under the delusion that it was his duty to offer himself as a sacrifice for his fellow men; and that he must do some act by which he should be visited with the extreme penalty of the law. Erskine, his defender, claimed that this delusion was the cause of his act, and that it rendered him irresponsible. Lord Kenyon concurred with him, and ordered the withdrawal of the prosecution.

In the case of Martin, tried in 1829, the prisoner fired the cathedral at York. He knew the act to be contrary to law—that it was a capital felony, and expected to be hanged for it. He was acquitted as undoubtedly insane—having done the act, as the judges said, "under the insane delusion of producing a public benefit." See 71 Ann. Reg., 301; also Regina v. Tyler, 8 C. & P., 616; Tonchett's case, 1844, in the Central Criminal Court; also the case of Brixey, in the same court, 1845. In the latter case, a servant maid, who had for some months been suffering under disordered menstruation; no one had ever suspected, nor had she given any signs of insanity; she cut the throat of her master's baby, and immediately rushed into his presence, exclaiming, "Oh what will become of me! I have murdered the dear baby! Will you, sir, forgive me? Will God forgive me?" She was acquitted on the ground of insanity.

### PAROXYSMAL INSANITY.

In the case of Regina v. Vyse, 3 Foster & Fin., 247, a mother poisoned her children whom she fondly loved—the poison having been obtained deliberately, under pretence of killing rats. She was acquitted on the ground of "paroxysmal insanity"—the physician testifying that the impulse to violence may be dormant for weeks or months, and then break out into a suicidal or homicidal act.

Delusion is also admitted as one test of insanity, in the ecclesiastical courts; Dew v. Clark, 3 Addams, 79; Frere v. Peacocke, 1 Robertson, 442.

The case of Com. v. Rogers, 7 Met., 500, cited and quoted by our chief justice, is justly regarded as a leading case on the

same point. To the same effect, see Roberts v. State, 3 Ga., 310; People v. Pine, 2 Barb., (N. Y.,) 571; and Regina v. Law, 2 Foster & Fin., 836.

Uncontrollable impulse—moral insanity—that disease of the mind which takes away the power of choosing between duty and the act complained of—seems to be recognized in many cases. State v. Windsor, 5 Harring., 512; Reg. v. Bleasdale, 2 C. & K., 765; Com. v. Mosler, 4 Barr, 267; Lewis' Cr. Law, 404; The People v. Sprague, 2 Park. C. C., 43; Sanchez v. People, 4 ib., 535; Steph. Cr. Law, 91; 2 Am. Jour. of Ins. (1846), 261: U. S. v. Hewson, 7 Boston Law Rep., 361; Scott v. Com., 4 Met. (Ky.), 227; Smith v. Com., 1 Duvall, 224; Hopps v. State, 31 Ill., 385; Billman's Case, in 1 Whart. Crim. Law, 30; Com. v. Shurlock, Legal Int. (1857), 83; Com. v. Smith, ib., (1858), 33; Com. v. Freath, 6 Am. L. Reg., 400; see Appendix to Huntingdon's Trial; but see Reg. v. Haynes, 1 Fost. & Fin., 666; and State v. Brandon, 8 Jones (N. C.), 136.

Is not the real difference between the impulse of *passion* and that of a *diseased mind?*

Thus, while the decisions have been fluctuating, and while there has been an inability to give a definition of insanity satisfactory to all, these conclusions seem to follow: That the accused is not accountable,

1. If he was incapable of knowing that the act charged was wrong—contrary to the law of the land.

2. If he did the act under a positive *bona fide delusion*, as to the existence of certain facts, which were wholly imaginary, but which, if they had existed, would have been a good defense; or,

3. If he did the act under some uncontrollable impulse, the result, not of ungovernable *passion*, but of a *diseased mind.*

### EVIDENCE.

As to the evidence in regard to insanity—that of *experts* and *non-experts.*

It seems that a higher degree of insanity must be shown in criminal than in civil cases; 2 Greenl. Ev., § 372; but the rule seems to be the same in both cases, as to what evidence should be admitted or excluded. Rex v. Watson, 2 Stark., 155; Reg.

v. Murphy, 8 C. & P., 297; Rex v. Burdett, 4 Barn. & Ald., 122; Lewis v. Lewis, 9 Ind., 105.

And though the question is as to the insanity of the party at the very time the act was done, yet his conduct and declarations before and after that time may be proved. Peaseley v. Robbins, 3 Metc., 164; ·Norwood v. Morrow, 4 Dev. & Batt., 442; Vance v. Com., 2 Va. Cases, 132; Grant v. Thompson, 4 Conn., 203; Dickenson v. Barber, 9 Mass., 225; United States v. Sharp, 1 Peters C. C., 118; Bryant v. Jackson, 6 Humph., 199; McAllister v. State, 17 Ala. 434; McLean v. State, 16 ib., 672; Kinne v. Kinne, 9 Conn., 102; People v. March, 6 Cal., 543; Beavam v. McDonnell, 10 Exch., 184; 26 Eng. Law & Eq. Rep., 184; Lake v. People, 1 Parker C. C., 495.

And where *general* insanity is proved to have existed prior to the act, its continuance up to that time will be presumed, and the prosecution must then show the occurrence of a lucid interval. Cartwright v. Cartwright, 1 Phillimore, 100; Jackson v. Van Dusen, 5 John., 144; Armstrong v. Timmons, 3 Harring., 342; Jackson v. King, 4 Cow., 207; The State v. Spencer, 1 Zab., 196; Crouse v. Holman, 19 Ind., 30; Hoge v. Fisher, 1 Peters C. C., 163; and the same may be said of *partial* insanity —Thornton v. Appleton, 29 Maine, 298—unless such prior insanity was caused by some violent disease, in which case the presumption of continuance does not apply, for *cessante ratione, cessat ipsa lex.* Hix v. Whittemore, 4 Metc., 545.

Such a presumption calls for proof of habitual, not occasional insanity. Lewis v. Baird, 3 McLean, 56; Brooke v. Townshend, 7 Gill, 10; Legeyt v. O'Brien, 1 Mil., 334; State v. Sewell, 3 Jones (N. C.), 245; Stewart v. Reddell, 3 Maryland, 67.

*Hereditary insanity* may be proved both in criminal and civil cases. Regina v. Tuckett, 1 Cox C. C., 103; Baxter v. Abbott, 7 Gray, 71; Regina v. Oxford, 9 Carring. & Payne, 525; Smith v. Kramer, 1 Am. Law Reg., 353; State v. Windsor, 5 Harring., 512; State v. Christmas, 6 Jones (N. C.), 471.

*Insanity of brothers and sisters:* evidence of this is *competent*, even without proof of ancestral taint, the weight of it being

solely for the jury.  People v. Garbutt, 17 Mich., 9 ; Regina v. Oxford, 9 C. & P., 525.

*Medical books,* containing opinions of medical gentlemen of the highest authority, are inadmissible.  Commonwealth v. Wilson, 1 Gray, 337 ; Ashworth v. Kittridge, 12 Cush., 193 ; State v. O'Brien, 7 R. I., 336 ; Collier v. Simpson, 5 C. & P., 74 ; Cocks v. Purday, 2 C. & K., 270 ; Carter v. State, 2 Carter, 617 ; Melvin v. Easley, 1 Jones, 386.

The reading of such books to the jury would seem to be forbidden.  Regina v. Cranch, 1 Cox C. C. 94 ; Washburn v. Cuddihy, 8 Gray, 430 ; Gehrke v. The State, 13 Texas, 568.

But whether this is not a matter for the discretion of the court ?  Luning v. The State, 1 Chandler, 178.

Professional gentlemen who are acquainted with the disease of insanity, and *who have personally examined the party to whom insanity is attributed,* may give their opinion upon the direct question whether he was insane or not.  People v. Lake, 2 Kernan, 358 ; McAllister v. The State, 17 Ala., 434 ; In Re Vananken, 2 Stock., 186.

But as to whether persons so conversant with insanity (*experts*), and who have heard all the testimony adduced at the trial, but who have never had any personal knowledge of the party, can give their opinion on the sanity or insanity of that party, supposing the facts detailed to be true ; the practice in America is in favor, and in England against, the admission of such opinion.

The proper mode of eliciting this " opinion," is, in substance, this : Premising that the expert shall have attended the whole trial, and shall have heard *all* the testimony as to the facts and circumstances of the case, and that he is not to judge of the credit of the witnesses, or of the truth of the facts testified by others (which are questions for the jury), the proper question is this : If the symptoms and indications testified to by the other witnesses are proved, and if the jury are satisfied of the truth of them, whether, in his opinion, the party was insane ?  See Commonwealth v. Rogers, 7 Metcalf, 500 ; The People v. Luke, 2 Kernan, 358 ; Same v. Thurston, 2 Parker C. C., 49 ; Sanchez v. The People, 22 New York, 147–154 ; United States v.

McGlue, 1 Curtis C. C., 9 ; Woodbury v. Obear, 7 Gray, 467 ; The People v. McCann, 4 Parker C. C., 297 ; Wharton's Crim. Law, 94 ; McAllister v. The State, 17 Ala., 434 ; Clark v. The State, 12 Ohio, 483 ; Potts v. House, 6 Georgia, 324 ; Terry v. Townsend, 9 Maryland, 145. See also State v. Windsor, 5 Harrington (Del.), 534 ; Spear v. Richardson, 37 New Hamp., 23 ; Champ v. The Commonwealth, 2 Metcalfe (Ky.), 17.

The English practice is different. See the cases of Ferrers, and McNaughten, cited *supra*. Also Rex v. Wright, Russell and Ryan C. C., 451 ; Regina v. Southey, 4 Foster & Finlason, 887 ; Regina v. Frances, 4 Cox C. C., 57. In this case :

Alderson, B., and Cresswell, J. said : " The proper mode is to ask what are the symptoms of insanity, or to take particular facts, and assuming them to be true, to ask whether they indicate insanity on the part of the prisoner," etc., not allowing the witness " to decide upon the whole case."

[The distinction between the American and English practice is understood to be, that the former does and the latter does not permit the opinion of the expert on the result of *the very facts* testified to the jury, (as to whether they constitute insanity or not,) the objection being that the witness would thereby take on himself the functions of the jury, in deciding upon the weight or preponderance of the evidence.]

See further to the same point : Rex v. Searle, 1 Moody & Robinson, 75 ; Rex v. Offord, 5 Carring. & Payne, 168 ; Doe d. Bainbrigge v. Bainbrigge, 4 Cox C. C., 454 ; the case of Pate, cited above ; Malton v. Nesbitt, 1 Carring. & Payne, 70 ; Fenwick v. Bell, 1 Carring. and Kirwan, 312 ; Beckwith v. Sydebotham, 1 Campbell, 116 ; Thornton v. Royal Exchange Assurance Co., Peake, 25 ; also Commonwealth v. Rich, 14 Gray, 335 ; Clark v. State, 12 Ohio, 483.

The expert is not permitted to give his *mere opinion*—Clark's case, *supra* ; Hathorne v. King, 8 Mass., 371 ; White v. Bailey, 10 Mich., 155 ; Dickenson v. Barber, 9 Mass., 225.

The opinion must be a *positive* one—the expert not being allowed to testify as to his *doubts* of a person's sanity. Sanchez v. the People, 22 N. Y., 147.

As to what physicians would not be allowed to give their

opinions as experts—as those *e. g.* who had always refused that class of cases—see Baxter v. Abbott, 7 Gray, 72 ; Commonwealth v. Rich, 14 Gray, 335 ; Caleb v. The State, 39 Miss., 722 ; State v. Hinkle, 6 Iowa, 380 ; State v. Knight, 43 Maine, 11.

As to whether witnesses not professional, *non-experts,* but who have, for a long time, personally known the individual charged with insanity, and have had opportunities of observing his habits, manners and conduct, can give their opinion of his sanity, see in the affirmative, Clary v. Clary, 2 Iredell, 78 ; Wheeler & Batsford v. Alderson, 3 Haggard, 574 ; Eagleton & Coventry v. Kingston, 8 Vesey, 449 ; Doe v. Reagan, 5 Blackf., 217 ; Harrison v. Rowan, 3 Washington C. C., 580 ; Baldwin v. State, 12 Missouri, 223 ; Wilkinson v. Pearson, 11 Harrington, 117 ; Dorsey v. Warfield, 7 Maryland, 65 ; Clark v. State, 12 Ohio, 483 ; Grant v. Thompson, 4 Connect., 203 ; Rambler v. Tryon, 7 Sargeant & Rawle, 90 ; Wogon v. Small, 11 Sargeant & Rawle, 141 ; Morse v. Crawford, 17 Verm., 499 ; Lester v. Pitsford, 7 Verm., 158 ; Gibson v. Gibson, 9 Yerger, 329 ; Potts v. House, 6 Georgia, 324 ; Calver v. Haslam, 7 Barbour, 314 ; Baldwin v. State, 12 Missouri, 233 ; Dewitt v. Barley, 13 Barbour, 550 ; Kinne v. Kinne, 9 Connect., 102 ; Dunham's Appeal, 27 Connect., 193 ; McDougal v. McLean, 1 Winston (N. C.), 120 ; Norris v. State, 16 Ala., 776 ; Florey v. Florey, 24 Ala., 241 ; Powell v. State, 25 Ala., 27 ; Cram v. Cram, 33 Verm., 15 ; Fairchild v. Bascom, 35 id., 398 ; Bricker v. Lighter, 40 Penn. St. Rep., 474 ; Pelamourges v. Clark, 9 Iowa, 1.

But see the following cases on the other side : Commonwealth v. Wilson, 1 Gray, 337 ; Poole v. Richardson, 3 Mass., 330 ; Needham v. Ide, 5 Pickering, 510 ; Commonwealth v. Fairbanks, 2 Allen, 511 ; Sears v. Shafer, 1 Barbour, 412 ; Baxter v. Abbott, 7 Gray, 71 ; Wyman v. Gould, 47 Maine, 159 ; Caleb v. State, 38 Miss., 722. See also opinion of Hand, J., in Culver v. Haslam, 7 Barbour, 314, *supra.* Also, Dewitt v. Barley, 5 Selden, 371, in which is cited the case of Wright v. Tatham, 5 Clark & Finnelly, 692 ; and 17 N. Y., 340 ; and Boardman v. Woodman, 47 New Hamp., 120.

The *burden* of proof of insanity, lies on the defendant.

Every man is presumed to be sane till the contrary appears—

and if the defendant relies on insanity as a defense, it is for him "*to make it clear,*" (says Baron Rolfe,) that he was insane at the time of committing the offense charged. "If the matter be left in doubt it will be the duty of the jury to convict." Rolfe, Baron, in Regina v. Stokes, 3 Carrington & Kirwan, 188; see also, Attorney General v. Paruther, 3 Brown C. C., 441; Lee v. Lee, 4 McCord, 183; Jackson v. King, 4 Cowen, 207; Hoge v. Fisher, 1 Peters C. C., 163; Jackson v. Van Dusen, 5 Johnson, 144; The State v. Stark, 1 Strobbart, 479; The People v. Robinson, 1 Parker C. C., 649; Lake v. The People, 1 Parker C. C., 495; Regina v. Layton, 4 Cox C. C., 149; Regina v. Turton, 6 Cox C. C., 385; Regina v. Higginson, 1 Carrington & Kirwan, 130; and Regina v. Stokes, 3 same, 188. See also, The State v. Bringea, 5 Ala., 244; The State v. Huting, 21 Missouri, 476; People v. Myers, 20 Califor., 518; The State v. Spencer, 1 Zabriskie, 202.

But if "the preponderance of the evidence" be in favor of the insanity of the prisoner, the jury will be authorized to find him insane. Shaw, C. J., in Commonwealth v. Rogers, 7 Metcalf, 500. See also, Commonwealth v. Eddy, 7 Gray, 583; Loeffner v. The State, 10 Ohio St. Rep., 598; Fisher v. The People, 23 Illinois, 283; Polk v. The State, 19 Indiana, 170; People v. McCann, 18 New York, 58, reversing the case in 3 Parker C. C., 272; The State v. Ellick, 1 Winston (N. C.), 56; The State v. Starling, 6 Jones (N. C.), 366; State v. McCoy, 34 Missouri, 531; The People v. Garbutt, 17 Michigan, 9; Commonwealth v. York, 9 Metcalf, 94; Campbell v. The People, 16 Illinois, 17; Miller v. The People, 39 id., 458; Fife v. The Commonwealth, 29 Penn. St. Rep., 429; Smyth v. Jefferies, 9 Price, 257.

*Principals and accessories.*

If a party be charged as principal, and other parties as accessories, and the principal be adjudged insane, the other parties cannot be found guilty as accessories, though they may be as principals. Regina v. Tyler, 8 Carrington & Payne, 616.

*The defense of insanity before the grand jury.*

If the grand jury find that the accused did acts which would be murder in a person of sound mind, they should bring in a

true bill—the defense of insanity not being for their consideration. See Regina v. Hodges, 8 Carrington & Payne, 195 ; also, United States v. Lawrence, 4 Cranch C. C., 514.

[In regard to the question of doubt, as to the insanity of the accused, on the minds of the jury—and whether, if they have a *reasonable doubt*, they should not acquit:

See the cases collected on pages 305, 6 and 7, of Bennett's work.]